466 F.Supp. 564 (1979)
INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), Plaintiff,
v.
NATIONAL CAUCUS OF LABOR COMMITTEES et al., Defendants.
No. 74 Civ. 5131.
United States District Court, S. D. New York.
January 12, 1979.
*565 *566 D. Robert Owen, Robert M. Pennoyer, Gene M. Bauer, Patterson, Belknap, Webb & Tyler, New York City, Roger L. Zissu, Cowan, Liebowitz & Latman, P. C., New York City, for plaintiff.
Mortimer Todel, New York City, David S. Heller, New York City, for defendants.

OPINION AND ORDER
PIERCE, District Judge.
This action is brought by plaintiff ("UAW") International Union, United Automobile, Aerospace and Agricultural Implement Workers of America to recover damages for trademark infringement, unfair competition and prima facie tort. The core of the action is the alleged infringement of the name "Solidarity" in plaintiff's publication by defendants' use of the name "New Solidarity" in their publication. Defendants are the National Caucus of Labor Committees ("NCLC") and various individuals allegedly related to this organization. Defendants have counterclaimed essentially alleging malicious conduct on the part of plaintiff and violations of defendants' civil rights.
The trademark infringement and unfair competition claims were severed from the other claims and counterclaims, and were placed on the Court's ready trial calendar for trial in summer 1977.[1] By letter of July 17, 1977, defendants' attorney, David S. Heller, informed the Court of alleged unethical conduct on the part of plaintiff's attorneys. The allegations were eventually presented in the form of a motion to disqualify ("the first motion") which was referred to Magistrate Kent Sinclair.
In the first motion, defendants essentially asserted that one of plaintiff's potential trial witnesses, Gregory Rose, was a Federal Bureau of Investigation informant who allegedly infiltrated the NCLC security staff. Defendants alleged that Rose functioned in a legal or semi-legal capacity with NCLC and even stole legal papers from NCLC which he then allegedly transmitted to plaintiff's counsel and to the FBI. This information is set forth in affidavits from defendant's counsel (Heller) and NCLC officers *567 (Spannaus; Inch). In an opposing affidavit, Rose denied these allegations and also denied having access to any privileged communications. In their affidavits plaintiff's trial counsel, Roger Zissu, and Stephen Schlossberg, general counsel to UAW, also denied receiving the privileged communications alleged by defendants.
On December 2, 1977, Magistrate Sinclair recommended that defendants' motion be granted insofar as disqualifying Roger Zissu, and his firm, Cowan, Liebowitz & Latman, as well as Schlossberg. Voluminous papers objecting and supporting the Magistrate's report were submitted to the Court. Plaintiff requested D. Robert Owen of the firm, Patterson, Belknap, Webb and Tyler, to represent it on the first motion. No objection was initially voiced by defendants and an order was signed on March 23, 1978 adding Owen and his firm as counsel. On March 30, 1978, while objections to the Magistrate's report were sub judice, Heller advised the Court of possible ethical problems in Owen's appearance. Specifically, he objected to Owen's appearance because two members of Owen's firm, Harold R. Tyler, Jr. and Rudolph W. Giuliani, were formerly United States Deputy Attorney General and Associate Deputy Attorney General, respectively, in the Justice Department. It is apparently undisputed that the FBI conducted an investigation of the NCLC during the period Tyler and Giuliani were with the Justice Department. Defendants allege that because of their positions Tyler and Giuliani had access to confidential information about the defendants. On this basis, defendants now move to disqualify Owen and his firm for alleged violations of Canon 9 and Disciplinary Rule 9-101(B) ("the second motion").

Discussion
Canon 9 of the American Bar Association's Code of Professional Responsibility ("the Code") states as an axiomatic norm that "[a] lawyer should avoid even the appearance of impropriety." The two statements which deal specifically with former governmental employees are Ethical Consideration 9-3 and Disciplinary Rule 9-101(B). Ethical Consideration 9-3 states:
"After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists."
Disciplinary Rule 9-101(B) states:
"A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." (Emphasis supplied).
The Code explains that "[t]he Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Courts have traditionally looked to the Code in determining disqualification motions. See Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 n. 2 (2d Cir. 1977); Handelman v. Weiss, 368 F.Supp. 258, 261 n. 4 & 263 (S.D.N.Y.1973) and cases cited therein.
As a starting point, the Court heeds the admonition of Chief Judge Kaufman:
"When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and the precise application of precedent." Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 (2d Cir. 1977), quoting United States v. Standard Oil Co., 136 F.Supp. 345, 367 (S.D.N.Y.1955).
Further, it is noted that particularly in a case such as this which has engendered such bitterly contested litigation during its four years[2] and which promises to continue doing so:

*568 "the attempt by an opposing party to disqualify the other side's lawyer must be viewed as a part of the tactics of an adversary proceeding. As such it demands judicial scrutiny to prevent literalism from possibly overcoming substantial justice to the parties." J. P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975); see Woods v. Covington County Bank, 537 F.2d 804, 813 (5th Cir. 1976).
The standard for determining whether there is a violation of DR 9-101(B) is (1) whether any dealings Tyler and Giuliani had while in government employ are the same "matter" as involved in the present case or the first motion, and (2) whether they had "substantial responsibility" for those dealings.
"When assessing the similarity of the subject matter in the context of both Canon 9's requirement that an attorney avoid the appearance of impropriety and Canon 4's requirement that an attorney not disclose the confidences of his client, the courts of this circuit have frequently applied the so-called `substantially related' test." Allbrand Appliance & Television Co. v. Advent Corp., 78 Civ. 2510, slip op. at 4-5 (S.D.N.Y. Dec. 4, 1978).
As originally formulated in T. C. Theatre Corp. v. Warner Brothers Pictures, Inc., 113 F.Supp. 265 (S.D.N.Y.1953), the test provided that:
"the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation." Id. at 268.
Thus, the substantial relationship test "created an inference that confidential information was reposed. [C]omplainant need[ed] only [to] show access to such substantially related material and the inference that defendant received these confidences [would] follow." United States v. Standard Oil Co., 136 F.Supp. 345, 354 (S.D.N.Y.1955). Recent cases have honed the substantial relationship test to the point of granting disqualification only upon a showing that the relationship between issues in the prior and present cases is "patently clear." See Government of India v. Cook Industries, Inc., 569 F.2d 737, 739-40 (2d Cir. 1978); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 754-56 (2d Cir. 1975). In fact, disqualification has generally been granted only when the issues involved have been identical (see Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975); General Motors Corp. v. City of New York, 501 F.2d 639 (2d Cir. 1974); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973)) or "essentially the same" (Motor Mart, Inc. v. Saab Motors, Inc., 359 F.Supp. 156 (S.D.N.Y.1973)).
In 1975, the American Bar Association Committee on Professional Ethics issued an opinion in an attempt to provide some guidance on DR 9-101(B). See ABA Formal Opinion No. 342 (Nov. 24, 1975), published in 62 A.B.A.J. 517 (1975) (hereinafter cited as "Opinion 342"). The ABA defined "matter" as contemplating:
"a discrete and isolatable transaction or set of transactions between identifiable parties. Perhaps the scope of the term `matter' may be indicated by examples. The same lawsuit or litigation is the same matter. The same issue of fact involving the same parties and the same situation or conduct is the same matter. By contrast, work as a government employee in drafting, enforcing or interpreting government or agency procedures, regulations, or laws, or in briefing abstract principles of law, does not disqualify the lawyer under DR 9-101(B) from subsequent private employment involving the same regulations, procedures, or points of law; the same `matter' is not involved because there is lacking the discrete, identifiable transactions or conduct involving a particular situation and specific parties." Opinion 342 at 6, 62 A.B.A.J. at 519 (footnotes omitted).
*569 In the present case, it appears that there are two situations in which Tyler or Giuliani may have been involved which might constitute the same matter as this lawsuit or the first motion. First, Tyler states that he reviewed a Freedom of Information Act appeal of one of the defendants herein, Nancy Spannaus. (Tyler affidavit ¶¶ 3 & 4). Second, Tyler states that he approved the continuance by the FBI of a domestic security investigation of the defendants. (Tyler affidavit ¶¶ 5 & 6). Giuliani apparently had no connection with the FOIA matter (Giuliani affidavit ¶ 5), but states that it was his practice to review staff summaries regarding FBI investigations and that he attended a 20 minute meeting which discussed the aforesaid investigation (Giuliani affidavit ¶ 7).
The Court has no hesitation in finding that Tyler's review of the FOIA request of Nancy Spannaus did not involve the same matter as this litigation or the first motion. Tyler's affidavit points out that the processing of the administrative review was a routine matter. Defendants have not shown otherwise or that Tyler viewed any deleted material which might have been confidential information related to this litigation. The Court finds no reason to discredit the affidavit of Quinlan J. Shea, Jr., the Director of the Office of Privacy and Information Appeals in the Deputy Attorney General's Office. Shea stated that record reviews were routinely processed and presented to Tyler "in the form of a memorandum, which usually included the background of the case, the position of the component involved, a description of the records in question and a proposed final action . . .. If the Deputy Attorney General agreed with the recommendation . . . he signed a letter drafted by this office to accompany the memorandum, informing the appellant of the final agency action on the appeal." (Shea affidavit ¶ 4).
A closer question is presented regarding the review of an FBI summary on whether to continue an investigation of the NCLC. Plaintiff asserts that the matter involved in passing upon this review was whether the NCLC and others were engaging in activities that involved violence or potential violence that constituted possible violations of federal law, for the purpose of overthrowing or interfering with the government of the United States or a state or depriving persons of their civil rights. See Attorney General Guidelines for Domestic Security Investigations (March 3, 1976), attached to Exhibit 4. However, the Court understands defendants' argument to assert that in deciding whether to continue the FBI investigation Tyler and Giuliani necessarily had to review confidential information regarding the defendants. Even in this situation, the Court is hard-pressed to find that the same matter is involved. There appears no reason to doubt Tyler and Giuliani's assertions that they never reviewed original source documents and had no access to the underlying FBI documents used in preparing the summaries. Defendants contend that Exhibit 5 is the FBI summary in question, but Tyler and Giuliani have no specific recollection that this is the document in question. It is undisputed that the review occurred in summer 1976 and it appears likely that this document is the FBI summary since it is dated July 15, 1976. Most of the document has been withheld by the government and has not been provided to the defendants. However, even the headings of Exhibit 5 attest to the matters for which the summary was prepared, e. g., "B. Basis of Investigation; 1. Force and Violence, 2. Foreign Influence, etc." The review of the continuance of the investigation was conducted pursuant to certain stated guidelines.
On the other hand, the present case involves alleged trademark infringement and unfair competition. The first motion involves the status and contacts of a person formerly with the NCLC and his alleged transmittal of privileged communications of defendants to plaintiff's attorneys. The essence of defendants' argument is that there was privileged information which may or may not have been stolen by Rose which may or may not have been presented to the FBI which may or may not have led to the FBI obtaining information not known to *570 defendants or confidential information which may or may not have appeared in the summaries reviewed by Tyler and Giuliani.[3] Even if such a sequence of events occurred, defendants have not demonstrated how such knowledge on the part of Owen would be relevant to the plaintiff's position in the first motion. The Court emphasizes that the relationship must be "patently clear" or, at the minimum, substantial. Here it is neither.
During oral argument on this second motion, defendants' attorney also hypothesized that the FBI investigation may or may not have obtained information relating to the trademark infringement or unfair competition claims which are at issue in this action. The Court notes that Owen entered this lawsuit for the limited purpose of representing plaintiff's attorney in the first motion. Drawing the additional inference defendants urge would lengthen an already tenuous chain of "if's." While Canon 9 does imply that there need be no proof of actual wrongdoing, mere speculation will not suffice. See Woods v. Covington County Bank, 537 F.2d 804, 813 (5th Cir. 1976). The Court finds that this is not an appropriate case for disqualification based upon speculation that the FBI summary may have contained confidential information related to the present litigation, when the more reasonable inference is that the document contained material solely related to domestic security.[4]
Even if the Court were to determine that the same matters were involved, the Court finds that neither Tyler nor Giuliani had "substantial responsibility." "We wish to note that DR 9-101(B) does not automatically require disqualification if the lawyer, as a government employee, merely had actual or imputed knowledge of the facts relating to a matter. Disqualification is required only if the lawyer had `substantial responsibility.'" Opinion No. 889 of the Association of the Bar of the City of New York, 31 The Record 552, 560 (1976).
Defendants contend that since Tyler and Giuliani were heads of government offices or subdivisions, a principle of "vertical imputation of knowledge" is applicable. This principle was explained by Chief Judge Kaufman in The Former Governmental Attorney and The Canons of Professional Responsibility, 70 Harv.L.Rev. 657 (1957):
"Although there are many supervisory officials who are ultimately responsible for myriad decisions which they do not personally make and for numerous rulings which they never actually review, nonetheless, since ultimate responsibility is theirs, knowledge of all work done by their subordinates should be imputed to them. This position is similar to the conclusion that the specific requirement to perform a related task will disqualify regardless of whether that assignment was actually performed. I believe this rule of vertical responsibility is absolutely essential to avoid the appearance of evil." Id. at 666.
This statement was written in the context of Canon 36, the predecessor of Canon 9. Opinion 342 explains substantial responsibility as
"envisag[ing] a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the *571 matter in question. It contemplates a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question. Thus, being the chief official in some vast office or organization does not ipso facto give the government official or employee the `substantial responsibility' contemplated by the rule in regard to all the minutiae of facts lodged within that office. Yet it is not necessary that the public employee or official shall have personally and in a substantial manner investigated or passed upon the particular matter, for it is sufficient that he had such a heavy responsibility for the matter in question that it is unlikely he did not become personally and substantially involved in the investigative or deliberative processes regarding that matter. With a responsibility so strong and compelling that he probably became involved in the investigative or decisional processes, a lawyer upon leaving the government service should not represent another in regard to that matter." Opinion 342 at 9, 62 A.B.A.J. at 520 (footnotes omitted).
In the present case, there has been no showing that the decision on the FOIA appeal was anything other than perfunctory. While there may still be a rule of vertical imputation of knowledge, "the courts have permitted lawyers to rebut the inference that they were in actual possession of information relating to the later litigation while serving in their former capacities." Allbrand Appliance & Television Co. v. Advent Corp., 78 Civ. 2510, slip op. at 9 (S.D.N.Y. Dec. 4, 1978). The Court also does not find that Tyler or Giuliani's participation in the FBI investigation of NCLC involved them to an important, material degree, in the investigative processes regarding either the first motion or the trademark and unfair competition claims.
Even the testimony of the attorney whose ethical conduct is questioned has been considered sufficient rebuttal. See Laskey Brothers of West Virginia, Inc. v. Warner Brothers Pictures, Inc., 224 F.2d 824, 827 (2d Cir. 1955), cert. denied, 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956) ("It will not do to make the presumption . . . rebuttable and then make the standard of proof for rebuttal unattainably high. This is particularly true where, as here, the attorney must prove a negative, which is always a difficult burden to meet.") The Court concludes that the affidavits of Tyler and Giuliani which deny any knowledge have sufficiently rebutted any inference of their knowledge that may arise by virtue of their prior positions.
Finally, defendants contend that the mere retention of Tyler's firm creates the appearance of impropriety since Tyler was formerly with the Justice Department. The Court notes that this is not the type of "appearance of evil" which has generally been discussed. The Second Circuit has stated that the purpose of Canon 9 is to avoid the possibility that a former government lawyer's action as a public officer "might be influenced (or open to the charge that it had been influenced) by the hope of later being employed privately to uphold or upset what he had done." General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2d Cir. 1974), quoting ABA Committee on Professional Ethics, Opinion No. 37 (1931). See also United States v. Standard Oil Co., 136 F.Supp. 345, 359 (S.D.N.Y.1955). The logical extension of defendants' contention appears to be that there would be an appearance of impropriety in plaintiff's retention of Tyler's firm in a case in the Southern District of New York since Tyler was formerly a judge in this district. The Court does not adopt such a restrictive reading of Canon 9. It is noted that Canon 36, the predecessor of Canon 9, might have warranted an interpretation in accord with defendants' contention. Canon 36 stated:
"A lawyer having once held public office or having been in public employment, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ." (Emphasis supplied). *572 However, EC 9-3 speaks of "substantial responsibility." Canon 9 was adopted to replace Canon 36 precisely because Canon 36 "proved to be too broadly encompassing." Opinion 342 at 7, 62 A.B.A.J. at 519.
Further, it has been suggested that if the tests of same "matter" and "substantial responsibility" are not met, there can be no appearance of impropriety. See Note, 44 Fordham L.Rev. 130, 145 (1975) ("If courts cannot find on the facts that substantially related matters are involved or cannot make the inference of confidential knowledge, courts should not rely on Canon 9 to justify a disqualification order."). Cf. Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 757 (2d Cir. 1975) ("Although Canon 9 dictates that doubts should be resolved in favor of disqualification, . . . it is not intended completely to override the delicate balance created by Canon 4 and the decisions thereunder."). Finally,
"an inflexible application of Canon 9 would frequently defeat important social interests including the client's right to counsel of his choice, the lawyer's right freely to practice his profession, and the government's need to attract skilled lawyers." Woods v. Covington County Bank, 537 F.2d 804, 812 (5th Cir. 1976).
"We emphasize that an attorney need not be disqualified even where there is a reasonable possibility of improper professional conduct. [A] court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case. Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." Id. at 813 n.12.
The Court does not make such a finding in this case.[5]

Conclusion
For the foregoing reasons, defendants' motion to disqualify D. Robert Owen, Esq., and the firm of Patterson, Belknap, Webb and Tyler is hereby denied.
The Court hereby schedules an evidentiary hearing on defendants' first motion to disqualify for February 20, 1979 at 10:00 a. m. in Courtroom 906. Such a hearing is limited to aiding the Court in determining whether or to what extent Gregory Rose had any contact with the defendants' legal endeavors in this case and whether he transmitted any of defendants' privileged communications to plaintiff's attorneys. The parties are to premark and index their exhibits. Copies of the index and a list of witnesses to be presented at the hearing are to be exchanged between the parties prior to being provided to the Court on or before February 13, 1979. The Court recognizes that the determination of this second motion is directly appealable. Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974). Accordingly, defendants are directed to promptly notify this Court and plaintiff's counsel of their intent, if any, to appeal.
SO ORDERED.
NOTES
[1] Subsequent to the submission of pretrial papers, an additional dispute arose as to the pleadings and a notice of admission by default, which was referred to Magistrate Martin D. Jacobs on November 7, 1977. By order of that same date, the Court removed this action from its ready trial calendar in view of the continued pretrial litigation in the case.
[2] This action was filed on November 21, 1974. Approximately 16 separate motions have been made since that date to May 22, 1978. See also note 1, supra.
[3] The Court recognizes the problem of defendants in relying on government documents which they have not reviewed, but which the individuals they seek to disqualify have reviewed but do not recall. However, since the Court has no reason to doubt Tyler or Giuliani's lack of knowledge other than that stated in their affidavits, plaintiff does not appear to have any better knowledge than defendants. This is not to suggest that in other fact situations involving such a problem, the movant could not have a valid argument. The Court merely observes that it is under a similar disability as the parties since the actual summaries in question would appear to be in the custody of the Justice Department or the FBI, neither of whom are parties to this action.
[4] This reasoning would also appear applicable to Exhibit 10 which indicates that it was routed to Tyler who claims to have no independent recollection of it. The exhibit indicates that it is an "Internal Security Action Memorandum." Neither does the Court speculate as to the documents which were attached to Exhibits 6 through 9.
[5] Given the Court's denial of the disqualification motion, the Court need not consider whether screening would be appropriate in this case.