**Robert Allan CLEARY, Petitioner,**

v.

**The DISTRICT COURT IN AND FOR the EIGHTEENTH JUDICIAL DISTRICT and John P. Gately, One of the Judges Thereof, Respondents.**

**No. 85SA41.**

Supreme Court of Colorado,
En Banc.

Aug. 19, 1985.

---

**868**

Jeffrey A. Springer, P.C., Jeffrey A. Springer, Denver, for petitioner.

Respondents appearing pro se.

KIRSHBAUM, Justice.

In this original proceeding the petitioner seeks relief by means of prohibition from the respondent trial court's order denying a request by petitioner's retained counsel to enter an appearance on behalf of petitioner in a criminal case. We issued a rule to show cause, and now make the rule absolute.

The facts underlying this original proceeding are not disputed.[1] On April 27, 1984, a complaint and information was filed against petitioner in Division 2 of the Arap-

ahoe County District Court which charged petitioner with the crimes of aggravated incest and sexual assault on a child. At that time the respondent trial court presided over that division and Arapahoe County deputy district attorney Harvey Steinberg was assigned to it. Steinberg did not sign the complaint and information and in fact was serving as a special prosecutor on another case in another judicial district during that week. Steinberg left the district attorney's office and entered the private practice of law in October 1984.

Petitioner retained counsel, but on December 14, 1984, that attorney filed a motion for substitution of counsel which stated that the attorney was withdrawing from the case at petitioner's request. The motion also stated that Steinberg, as a member of the private law firm of Jeffrey A. Springer, P.C., was entering an appearance on behalf of petitioner. The respondent trial court granted the motion, but set a hearing for January 14, 1985, to review Steinberg's entry of appearance.[2]

At the outset of that hearing, Steinberg orally renewed the request that he and his firm be permitted to enter an appearance on behalf of petitioner. Steinberg stated that he had "no contact with the ... matter, either as far as any type of review of the case initially when it was brought in or any court appearances," and that he first learned of the existence of the case after he left the district attorney's office. Steinberg noted that the custodial parent of the minor children alleged to have been the victims of petitioner's conduct had no objection to Steinberg's entry of appearance. Steinberg also stated that petitioner, after being fully informed of the circumstances, desired to retain Steinberg as counsel.

1. The record consists of copies of certain pleadings, affidavits, and court records, including a copy of the transcript of the hearing to review counsel's entry of appearance. Petitioner has attached to his reply to the trial court's answer an affidavit of his counsel, Harvey Steinberg, dated March 6, 1985, which contains several averments. This affidavit was not submitted to the respondent trial court and will not be considered.

2. No motion other than the December 14, 1984, joint motion for substitution of counsel has been furnished to this court. A copy of what purports to be official minutes of the clerk of the court indicates that on December 14, 1984, "substitution of counsel" was *granted* and "[e]ntry of appearance by counsel Steinberg is set for review on [sic] by the court 12–19–84...." No record or purported record of the December 19 proceeding has been furnished.

This statement was confirmed by the petitioner, in response to questions posed to him by the respondent trial court.

Two affidavits were introduced into evidence at the hearing. One affidavit, executed by Robert Gallagher, District Attorney for Arapahoe County, stated that Steinberg, while employed as a deputy district attorney, "had no knowledge or contact with the Cleary case, either in the investigative stage, filing stage, or litigation stage," and that the district attorney's office had no objection to Steinberg's representation of petitioner. The other affidavit, executed by the guardian ad litem representing the alleged minor victims, stated that, to the affiant's knowledge, Steinberg had no contact or knowledge of the case while employed by the government and that the affiant had no objection to Steinberg's representation of petitioner. At the conclusion of the hearing, the respondent trial court noted that the information had been filed on April 27, 1984; stated that Steinberg was a member of the district attorney's office until October 1, 1984; and denied the request for entry of appearance on the ground that "there is a distinct possibility of an appearance of impropriety in the eyes of the general public...."

### I

When the propriety of an attorney-client relationship involving a lawyer previously employed by a governmental agency is raised in the course of litigation,[3] the standard of conduct set forth in Disciplinary Rule 9–101(B) (DR9–101(B)) of the Code of Professional Responsibility (the Code) is a primary source for resolution of the issue.[4] *Osborn v. District Court*, 619 P.2d 41 (Colo.1980). Disciplinary Rule 9–101(B) provides that "[a] lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." The rule, which has been adopted in this jurisdiction, *see Osborn*, 619 P.2d 41, was promulgated by the American Bar Association in response to the recognition that attorneys employed by government offices acquire special responsibilities with regard to information obtained during such employment and with regard to the exercise of the governmental authority entrusted to them. *See* ABA Comm. on Ethics and Professional Responsibility, *Formal Op. 342* (1975). Concerns that offers of employment to such attorneys might influence the discharge of their governmental duties, that sensitive or confidential information acquired during governmental service might later be used improperly to benefit clients in the private sector, and that while employed by the government such attorneys might seek to obtain private employment by improper use of information or improper exercise of authority, also led to the adoption of DR9–101(B) and its predecessor, Canon 36 of the ABA Canons of Profes-

---

**3.** The respondent trial court apparently initiated the inquiry into the propriety of Steinberg's participation in the case on its own motion on December 14, 1984, when the motion for substitution of counsel was filed and Steinberg, who was present, informed the court of his former position at the time the information was filed against petitioner. Although no party challenges the propriety of respondent trial court's *sua sponte* inquiry, we note that courts in many jurisdictions recognize the inherent responsibility and authority of a trial court for the supervision of the conduct of members of the bar practicing before it. *See, e.g., Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980); *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 605 (8th Cir.1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); *Kesselhaut v. United States*, 214 Ct.Cl. 124, 555 F.2d 791 (1977); *In*

*re Gopman*, 531 F.2d 262, 266 (5th Cir.1976); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.1975); *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385 (3d Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *In re Asbestos Cases*, 514 F.Supp. 914, 919–20 (E.D.Va.1981); *Empire Linotype School, Inc. v. United States*, 143 F.Supp. 627, 631 (S.D.N.Y.1956).

**4.** Although in its oral ruling the respondent trial court did not refer to any specific ethical standard, the record indicates that the rejection of the request of Steinberg and his firm to enter an appearance as petitioner's counsel was based on Canon 9 of the Code, which states that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

sional Ethics.[5] *See id.* The rule as drafted presents a relatively fact-specific approach to the problem, as opposed to some vague expression of general disapproval which might complicate rather than resolve particular controversies. *See, e.g., Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 370 F.Supp. 581 (E.D.N.Y. 1973), *aff'd* 518 F.2d 751 (2d Cir.1975).

We recognized in *Osborn,* 619 P.2d 41, that the critical test of improper conduct by former government employees under the mandatory provisions of DR9–101(B) is the requirement that the attorney have "substantial responsibility" in the matter while employed by the government.[6] The great majority of courts interpreting this rule have concluded that the phrase "substantial responsibility" refers to actual rather than theoretical conduct. *See, e.g., State v. Borg, Inc.,* 553 F.Supp. 178 (N.D. Ill.1982); *Kadish v. Commodity Futures Trading Commission,* 548 F.Supp. 1030 (N.D.Ill.1982); *In re Asbestos Cases,* 514 F.Supp. 914 (E.D.Va.1981); *International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) v. National Caucus of Labor Committees,* 466 F.Supp. 564 (S.D. N.Y.), *aff'd* 607 F.2d 996 (2d Cir.), *cert. denied,* 444 U.S. 839, 100 S.Ct. 77, 62

L.Ed.2d 51 (1979). ABA Formal Opinion 342, cited with approval in *Osborn,* reviews the origins, purposes and contemporary applications of DR9–101(B) and concludes that the prohibition against subsequent employment of a former government official mandated by this disciplinary rule requires some degree of personal involvement in a prior related matter.[7] *Formal Op. 342* at 118. This conclusion seems reasonable in view of the fact that the rule requires substantial responsibility *"in"* some matter, rather than substantial responsibility *"for"* some matter.

In *Osborn,* an attorney retained to represent a defendant facing a retrial on criminal charges had, when previously employed as a government prosecutor, interviewed the victim and numerous witnesses connected with the incidents underlying the charges filed against the defendant. In addition, the then deputy district attorney had engaged in several conversations with the chief prosecuting attorney about the case and, as a result of an ongoing relationship with the victim, had obtained information which would have been of great value in the defense of the charges pending against the defendant. Based on these facts, the conclusion was inescapable that while employed by the government the at-

**5.** Canon 36 stated as follows: "A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."

**6.** It is noteworthy that the Code was not designed to define legal criteria for resolution of issues raised by disqualification motions, but rather was drafted to delineate professional responsibilities of attorneys and, as a necessary consequence, to provide guidelines for professional disciplinary proceedings. *See* Sutton, *How Vulnerable is the Code of Professional Responsibility,* 57 N.C.L.Rev. 497, 514–16 (1979). Thus, in addition to the mandatory disciplinary rules, the Code contains "Canons" defined as "statements of axiomatic norms," and "Ethical Considerations" designed as aspirational suggestions for exemplary professional conduct. Preliminary Statement, Code of Professional Responsibility; *see also Price v. Admiral Insurance Co.,* 481 F.Supp. 374 (E.D.Pa.1979). Nevertheless, as we noted in *Osborn,* the considerations of policy and ultimate formulation of normative

statements contained in the Code present thoughtful and useful material for the resolution of disputes concerning disqualification of attorneys on ethical grounds.

**7.** The report contains the following pertinent language:

As used in DR 9–101(B), "substantial responsibility" envisages a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the matter in question. It contemplates a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question. Thus, being the chief official in some vast office or organization does not *ipso facto* give that government official or employee the "substantial responsibility" contemplated by the rule in regard to all the minutiae of facts lodged within that office.

*Formal Op. 342* at 118 (footnotes omitted).

torney had exercised "substantial responsibility" in the initial prosecution of the defendant she later sought to represent, and that pursuant to DR9–101(B) and DR5–105(D)[8] respectively, she and her law firm were prohibited from representing that defendant in the retrial.

The unrebutted evidence in this case establishes that Steinberg did not have substantial responsibility in the matter in which petitioner is involved. He had no personal involvement in the investigation, preparation or prosecution of the case filed against petitioner, discussed the case with no one while a government employee, and had no knowledge of any aspect of the case while employed as a deputy district attorney. Although Steinberg could have learned many facts about the case and could have been assigned specific tasks relating to its prosecution, the fact that such opportunities were present does not answer the question of whether he must be barred by DR9–101(B) from representing petitioner. We conclude that while employed by the government Steinberg did not have substantial responsibility in the case brought against petitioner. Therefore, he is not prohibited by DR9–101(B) from representing petitioner.

## II

■ The respondent trial court does not assert that Steinberg's conduct while a prosecutor constituted substantial responsibility in the case filed against petitioner. Rather, the trial court alludes to an imputed knowledge doctrine to conclude that representation of petitioner by Steinberg would constitute a possible appearance of impropriety. This argument correctly assumes that some standard other than the substantial responsibility test of DR9–101(B) is pertinent to the inquiry of whether in particular circumstances an attorney formerly employed by the government should be prohibited from representing a client who desires such representation. The fact that a prior government attorney may not be forced by the mandatory test of DR9–101(B) to abstain from representing a particular client as private counsel does not mean that such attorney may not be required by more general policy considerations to refrain from providing legal services to that client. *See, e.g., Rodriguez v. State,* 129 Ariz. 67, 628 P.2d 950 (1981); *State v. Rizzo,* 69 N.J. 28, 350 A.2d 225 (1975); *see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 658 F.2d 1355 (9th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982); *In Re King Resources Co.,* 20 Bankr. 191 (D.Colo.1982).

■ Those policy considerations are reflected by the appearance of impropriety language of Canon 9 of the Code.[9] The same concerns are reflected in the aspirational language of EC9–3, as follows:

> After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists.

Every attorney is privileged to acquire intimate and detailed information from a client because of the professional relationship established between them and, therefore,

---

**8.** DR5–105 provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate or any other lawyer affiliated with him or his firm may accept or continue such employment." Often DR5–105(D) and DR9–101(B) must both be construed in the context of a particular case because of the factual circumstances.

**9.** *See* supra note 4. We are aware that *Formal Op. 342* suggests that the appearance of impropriety language of Canon 9 should not be considered a test at all. Contrary views have been taken by ethics committees in other jurisdictions. *See, e.g., Kessenich v. Commodity Futures Trading Commission,* 684 F.2d 88 (D.C.Cir. 1982); *United States v. Miller,* 624 F.2d 1198 (3d Cir.1980); *In re Advisory Opinion on Professional Ethics No. 361,* 77 N.J. 199, 390 A.2d 118 (1978). We find the language appropriate in the context of disqualification litigation.

must seek to minimize conduct which could discourage client incentive to disclose confidential information. A government attorney, often privy to information obtained from third party sources about individuals, must be even more sensitive to this concern. Of course, any broad standard must be carefully applied to prevent its use as a weapon to force delays or to seek to interfere unjustly with a party's right to obtain representation by an attorney of that party's choice. *See generally International Electronics Corp. v. Flanzer*, 527 F.2d 1288 (2d Cir.1975). Nevertheless, the necessity of preventing abuse of government office is sufficiently compelling to warrant the adoption of an appearance of impropriety standard as a legal test for disqualification motions. *See Osborn*, 619 P.2d at 45; *see also In re Coordinated Pretrial Proceedings*, 658 F.2d 1355; *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974); *Handelman v. Weiss*, 368 F.Supp. 258 (S.D.N.Y.1973); *Rodriguez*, 129 Ariz. 67, 628 P.2d 950; *Rizzo*, 69 N.J. 28, 350 A.2d 225; *Alpha Investment Co. v. City of Tacoma*, 13 Wash.App. 532, 536 P.2d 674 (1975); *In re Coordinated Pretrial Proceedings*, 658 F.2d 1355; *Handelman v. Weiss*, 368 F.Supp. 258 (S.D.N.Y. 1973).

■ Because conduct that may appear improper in one set of circumstances may not be objectionable in another context, determination of whether a former government employee should be barred from representing a new client because of the appearance of impropriety must necessarily be committed to trial court discretion. In this case, the respondent trial court argues that the evidence establishes a possible appearance of impropriety because "[k]nowledge of the criminal cases assigned to the Court is imputed to" Steinberg. This statement is inaccurate.

Issues of whether and to what extent information known to one government employee should be imputed to a co-worker in the context of. disqualification questions were discussed in the early decision of *United States v. Standard Oil Co.*, 136 F.Supp. 345 (S.D.N.Y.1955). In that oft-cited opinion arising under Canon 36 of the former Canons of Legal Ethics, Judge Irving Kaufman distinguished between vertical and horizontal imputation of knowledge in government agencies, depending upon the structural and personal dynamics of a particular office, and suggested that when a lawyer "is head of his office or a subdivision ... there is, of course, imputed to him knowledge of the proceedings taken by his juniors." *Id.* at 362. The opinion further acknowledged, however, that problems of knowledge between division heads of coordinate rank within a large government agency might be determined on an *ad hoc* basis by means of a rebuttable presumption of imputed knowledge. *Id.; see also* Kaufman, *The Former Government Attorney and the Canons of Professional Ethics*, 70 Harv.L.Rev. 657 (1957).

In *United States v. Ostrer*, 597 F.2d 337 (2d Cir.1979), the court relied upon *Standard Oil* to conclude that a former special prosecutor was barred from representing a defendant in a criminal proceeding because the prosecution planned to call as witnesses persons who had been prosecuted or interviewed personally by the attorney when the latter had been employed by the government. Although the former prosecutor had in fact obtained special material knowledge about the potential witnesses, the court suggested that the same result would have been reached on the basis of "imputed knowledge." *Ostrer*, 597 F.2d at 339 n. 4. *See also United States v. Dorfman*, 542 F.Supp. 402 (N.D.Ill.1982). These decisions deal with the question of vertical imputation of knowledge—the extent to which a superior will be presumed to have knowledge of information known to and conduct performed by subordinate officials. We have no such situation in this case.[10]

---

10. References to the concept of imputed knowledge often appear in cases in which the question arises of whether an entire public defender's office must be disqualified because of conduct of one member of that office. *See, e.g., People v. Miller*, 79 Ill.2d 454, 38 Ill.Dec. 775, 404 N.E.2d 199 (1980); *People v. Robinson*, 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157 (1980); *Rodriguez*, 129 Ariz. 67, 628 P.2d 950. Similarly, when questions arise concerning the import of Canons 4 and 5 and their relevant disciplinary rules in the context of challenges to the partic-

■ Certainly, a government prosecutor may be presumed to have some knowledge of the cases prosecuted by his co-workers. However, in circumstances not involving vertical intra-agency relationships, we conclude that the presumption may be rebutted by contrary evidence. In this case, as we have previously indicated, any presumption that Steinberg had knowledge of the case filed against petitioner was rebutted by uncontradicted evidence. The respondent trial court erred in concluding that the knowledge of Steinberg's co-employees must be imputed to him.

■ The question remains whether under all the circumstances of this case Steinberg's representation of petitioner would constitute an appearance of impropriety and, therefore, should be prohibited.[11] We think not. It must first be noted that neither the prosecution nor the defense has objected to Steinberg's representation of petitioner. ·While not dispositive, this factor sharply distinguishes this case from others in which the former government employer or some interested party seeks disqualification of an attorney on ethical grounds.

■ In determining whether a former government attorney must be barred from representing a client because such representation would create an appearance of impropriety, the various policy considerations underlying such standard must be considered. The standard seeks to avoid the evil of switching sides, to prevent the use of confidential government information against the government and to discourage government lawyers from taking advantage of their positions to gain subsequent advantageous employment. In this case, the concern of avoiding the appearance of improper switching of sides is not assuaged at first blush by permitting Steinberg to participate as petitioner's attorney. However, Steinberg did not actually "switch" sides. He was never part of the government "side" in petitioner's case. There is no basis to suggest that permitting representation in this type of case would encourage government attorneys to abuse their public positions in order to obtain subsequent employment or would tend to compromise the government or other parties because of information acquired during government employment. On balance, we conclude that the facts of this case do not create an appearance of impropriety. Steinberg had no prior knowledge of any aspect of this case and, in the absence of

ipation of law firms in a case when a member of the firm is disqualified, imputation of knowledge discussions invariably occur. *See, e.g., Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186 (7th Cir.1979); *Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.,* 518 F.2d 751 (2d Cir. 1975); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir.1971); *Price v. Admiral Insurance Co.,* 481 F.Supp. 374 (E.D.Pa.1979); *City of Cleveland v. Cleveland Electric Illuminating Co.,* 440 F.Supp. 193 (D.Ohio 1977).

The question of imputed knowledge within the office of a district attorney has been addressed in other contexts by this court. In *DeLuzio v. People,* 177 Colo. 389, 494 P.2d 589 (1972), the defendant's right to due process of law was violated when a prosecuting attorney and others gave false testimony concerning whether certain material witnesses had been granted concessions in return for their testimony against defendant. Noting that the district attorney had reason to believe some agreement had been reached and under the circumstances should have made inquiry, we stated that "knowledge of the chief deputy and of the chief investigator for the district attorney is knowledge of the entire office." *Id.* at 395, 494 P.2d at 592. In *People v. Castro,* 657 P.2d 932 (Colo. 1983), wherein we concluded that an attorney who at the time of his client's criminal trial simultaneously represented the district attorney whose office was prosecuting the client impermissibly represented two conflicting interests, we observed that the knowledge and official actions of deputies and assistants "are imputable to the district attorney." *Id.* at 944. In *Jeffrey v. District Court,* 626 P.2d 631 (Colo. 1981), and *Corr v. District Court,* 661 P.2d 668 (Colo.1983), in which cases the question of prosecutorial knowledge of other offenses was addressed in the context of joinder of claims issues, we also alluded to the imputation of knowledge of deputy and assistant district attorneys to the district attorney.

11. While this question is normally reserved for the trial court's discretion, when the evidence is uncontradicted, as in this case, we may apply the appropriate legal test to determine whether disqualification is required. *See Trone v. Smith,* 621 F.2d 994 (9th Cir.1980).

any concern about his participation insofar as the parties are concerned, he should not be barred from representing petitioner.

The rule is made absolute, and the case is remanded for further proceedings.