**Richard OLIVIER et al.**

v.

**TOWN OF CUMBERLAND et al.**

No. 87–270 M. P.

Supreme Court of Rhode Island.

April 20, 1988.

Robert S. Stitt, Pearlman & Vogel, Providence, for plaintiffs.

George E. Healy, Jr., George T. Gilson, John A. Baglini, Higgins & Slattery, Providence, for defendants.

## OPINION

KELLEHER, Justice.

In late November 1982 several members of the Cumberland police department were directed to proceed to the scene of a two-car automobile collision. The mishap oc-

curred on Diamond Hill Road in the town of Cumberland. The operators of the two motor vehicles were Susan Olivier (Susan) and Richard Morin (Morin). Since Morin appeared to be under the influence of alcohol, the Cumberland police took him into custody. A routine on-the-scene investigation turned into a tragedy when Morin suddenly pulled out a gun, shot two of the officers, and fatally wounded Susan. As a result of this episode, criminal charges were lodged against Morin. The violence that occurred on Diamond Hill Road serves as a backdrop for the significant issue presented to us in this litigation.

When Susan's parents (the Oliviers) initiated this suit in August 1983, their attorney was Arlene Violet (Violet). The gist of plaintiffs' claim is that their daughter's death was the result of the police officers' negligence. The named defendants include Morin and the six officers who were present when the shootings occurred.

During the first fifteen months this case was pending in the Superior Court, Violet vigorously pursued various pretrial discovery procedures. Sometime in 1984, Violet declared her candidacy for the office of attorney general. After the ballots were cast in the November 1984 election, she was elected to that office. Before she assumed office, Violet arranged for other counsel to succeed her as trial counsel in any cases that were pending in the Superior Court. Jill Votta (Votta), a member of the Rhode Island Bar, entered her appearance in this litigation as attorney for the Oliviers.

Time marched on, and the November 1986 election was held. Violet's bid for reelection was unsuccessful. Sometime in early 1987, she returned to private practice. In March 1987 Votta withdrew her appearance as the Oliviers' attorney, and four days later Violet entered her appearance as Votta's successor.

Violet's reentry caused the town of Cumberland and the six individual police officers to file a motion asking that Violet be "barred" from representing the Oliviers because her return as counsel created an appearance of impropriety. In making this claim, defendants rely upon the provisions of Disciplinary Rule 9–101(B) of this court's Code of Professional Responsibility, which states, "A lawyer shall not accept private employment in a matter in which he [or she] had substantial responsibility while he [or she] was a public employee."

In responding to the motion, Violet submitted two affidavits—her own and an affidavit executed by an individual who was Violet's secretary during her term as attorney general. In her affidavit Violet states that while she was attorney general, she recused herself completely from any participation in the Morin case and had directed the deputy attorney general or his designee to make all decisions about the case without any input from her. She also stated:

"I at no time discussed this case or directed any part of it * * * I reviewed no tapes or transcripts of testimonies of Richard Morin * * * or the instant defendants * * * I received no knowledge whatsoever about these cases in my capacity as Attorney General."

The secretary, in her affidavit, explained that although Violet had held weekly meetings with her deputies and assistants to discuss cases, whenever the Morin case was discussed, Violet would leave the meeting and "[t]he case was discussed and decisions were made on the case without the Attorney General's input."

The disqualification motion was denied by a Superior Court justice. Thereafter defendants filed a petition for issuance of a writ of certiorari, which this court granted.

In addition to their claim of impropriety, defendants also argue that, as police officers, they should not be forced to concern themselves with a civil prosecution by a former member of the attorney general's staff with whom they were required to cooperate. The officers contend that unless their disqualification motion is granted, all police officers may lose confidence in the Office of the Attorney General and the "seeds of mistrust" will be sown between that department and the various police departments that operate within the state.

On the other hand, the Oliviers see no transgression by Violet of her duty to the public, the bench, or the bar in her dealing with these matters. Disciplinary Rule 9–101(B) consists of one simple declarative sentence; however, its promulgation presents a court with a plethora of factors that must be considered when the disqualification of an attorney is sought because of an alleged violation of the rule.

We begin our discussion of Rule DR 9–101(B) by first considering Formal Opinion 342 from the American Bar Association's Committee on Ethics and Professional Responsibility. There the committee pointed out that although the rule appears under the maxim of Canon 9—which directs attorneys to avoid even the appearance of professional impropriety—the appearance of impropriety is not a standard, test, or element of the rule. Rather, the committee has stated, "[t]he appearance of evil is only one of the underlying considerations * * * and is probably not the most important reason for the creation and existence of the rule itself." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 (1975), published in *Formal and Informal Ethics Opinions*, at 112 (1985).

The other considerations that precipitated the adoption of the rule include the treachery of switching sides, the safeguarding of confidential governmental information from future use against the government, the need to discourage government lawyers from handling particular assignments in such a way as to encourage their own future employment, and the professional benefit to be derived from avoiding the appearance of evil. *Id.* at 112–13.

In essence the issue to be determined when a litigant seeks to disqualify an attorney such as Violet from representing a client is whether the attorney has accepted "private employment" in a "matter" in which he or she had "substantial responsibility" while he or she was a "public employee." Here the first and last of these terms present no difficulty. Obviously Violet has now accepted private employment and was a public employee under the provisions of this rule.

The term "matter," according to Formal Op. 342, "seems to contemplate a discrete and isolatable transaction or set of transactions between identifiable parties." *Formal and Informal Ethics Opinions* at 115. The term also includes the same issue of fact involving the same parties and the same situation.

Although there are differences between the Olivier civil suit and Morin's criminal case, they both arose from the same situation and there is a substantial overlap of factual issues. It is true that with the exception of Morin, the parties are different in each case. Yet we believe that the criminal charges and the Olivier claim are so closely linked that they can be considered one matter for the purposes of DR 9–101(B). *Cf. Wagner v. Lehman Brothers Kuhn Loeb, Inc.*, 646 F.Supp. 643 (N.D. Ill. 1986) (a former attorney for the Securities and Exchange Commission (SEC) who, as a government lawyer, investigated possible violations by a broker may not later, as a private practitioner, represent a plaintiff in a civil action against the broker and his firm).

The central issue in the present dispute, we believe, is whether Violet had "substantial responsibility" for the Morin matter prior to her return as the Oliviers' counsel. This particular facet of the rule is generally considered most difficult to resolve. *See* Formal Op. 342, *Formal and Informal Ethics Opinions* at 116; *Cleary v. District Court*, 704 P.2d 866, 870 (Colo. 1985). When we look at the record, it appears that Violet stated—in an uncontradicted affidavit—that she had disassociated herself entirely with the criminal charges lodged against Morin because of her previous involvement with the Oliviers.

In interpreting the phrase "substantial responsibility," we deem it appropriate to quote from Formal Op. 342.

"[the term] envisages a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the matter in question. It contemplates a responsibility requiring the offi-

cial to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question. Thus, being the chief official in some vast office or organization does not *ipso facto* give that government official or employee the 'substantial responsibility' contemplated by the rule in regard to all the minutiae of facts lodged within that office. Yet it is not necessary that the public employee or official shall have personally and in a substantial manner investigated or passed upon the particular matter, for it is sufficient that he had such a heavy responsibility for the matter in question that it is unlikely he did not become personally and substantially involved in the investigative or deliberate processes regarding that matter." *Formal and Informal Ethics Opinions* at 118.

In *Cleary v. District Court*, the Colorado Supreme Court noted that the great majority of courts interpreting DR 9–101(B) have concluded that the phrase "substantial responsibility" refers to actual, rather than theoretical, conduct. 704 P.2d at 870. In *Cleary* the court ruled that a former deputy district attorney need not be barred from representing a defendant in a criminal case even though he had initially been assigned to handle the case while employed as a prosecutor. He had not actually handled or participated in any aspect of the case and in fact had been out of the office when it was assigned. The court concluded that the facts did not create an appearance of impropriety.

The court in *In re Petition for Review of Opinion No. 569*, 103 N.J. 325, 511 A.2d 119 (1986), reached a different conclusion in dealing with somewhat similar facts. There the court affirmed an ethics advisory opinion holding that a former deputy attorney general who had represented various state licensing boards was disqualified for a period of six months after leaving that position from representing a licensee facing possible disciplinary actions from one of those boards. The investigation leading to the possible disciplinary action had begun while the attorney was still employed by the attorney general's office. Although the attorney had had no connection with that particular investigation, the court nevertheless thought that his representation of the licensee before six months had expired would create the appearance of impropriety. The court emphasized that its holding was limited to the particular circumstances of that case and that it was not formulating a blanket rule.

As we noted earlier, the court in *Wagner* disqualified a former SEC attorney from representing a plaintiff in a civil suit against a broker. The suit had actually been filed earlier by a different lawyer while the attorney in question was an assistant regional administrator for the SEC. During his tenure, the SEC staff had investigated the broker and his firm, relying on a newspaper account of the civil suit. As an SEC supervisor at the time, the attorney had responsibility for the investigation and had participated in it personally. The court emphasized that the attorney had substantial discretion in the matter, he had participated to some degree in two case reviews on the matter, and he had access to confidential information disclosed in the investigation. More significantly, however, was the fact that his conduct, in the court's opinion, was the "antithesis of candor and forthrightness." *Wagner*, 646 F.Supp. at 667. The attorney had failed to inform anyone of the potential conflict; he refused to cooperate with defense counsel when the potential conflict was disclosed; he was aware before resigning from the commission that he would be working on this particular civil case in his new law firm; and when he arrived at the new firm, he began urging his former colleagues to reopen the commission's investigation.

■ In light of the policies and principles set forth in Formal Op. 342 and the cases to which we have referred, we affirm the trial justice's refusal to disqualify Violet. The mere fact that she had theoretical responsibility should not weigh against her when the uncontradicted evidence is that she had no actual responsibility for, or knowledge of, what was happening in the state's case against Morin. Violet's con-

duct is quite unlike that of the SEC attorney in *Wagner* because her actions were both forthright and candid. Violet has also exhibited an awareness of her ethical responsibilities. Again, unlike most attorneys who have been the subject of disqualification motions, Violet had represented the Oliviers prior to her term of public employment. This fact in and of itself avoids one of the evils that DR 9–101(B) is designed to address—that is, the possibility that a government attorney will take action while in office to facilitate his or her future employment.

We would also emphasize that any risk of a conflict of interest is less in the circumstances of this case than in the situation in which a former prosecutor undertakes to represent a defendant in a criminal case. The evil of an attorney's "switching sides" is not implicated here. In fact, the Oliviers' interest in suing Morin is closely aligned with the state's interest in prosecuting Morin. Their interest in suing the Cumberland police officers is different from, but not necessarily antithetical to, the state's interest in the criminal case.

■ Any possibility that Violet may have gained some confidential information about the case as attorney general is adequately rebutted by her uncontradicted statement that she gained none.

Any fear that Violet's representation of the Oliviers will sow the seeds of mistrust between police departments and the attorney general's department seems more apparent than real. This is not a policy consideration that DR 9–101(B)—or other sections of the Code of Professional Responsibility—is intended to address. There is no suggestion that the Cumberland police had failed to cooperate with the attorney general's department on the Morin investigation when Violet was in charge, despite the fact that she had already instituted the civil case when she was in private practice.

■ We do not believe that Violet's representation of the Oliviers would erode public confidence in law or the legal profession. Even if in some indefinite way it might "look bad," courts have held that the appearance of impropriety alone is " 'sim-

ply too slender a reed on which to rest a disqualification order except in the rarest of cases.' " *Sellers v. Superior Court,* 154 Ariż. 281, 289, 742 P.2d 292, 300 (1987).

Accordingly the petition for certiorari is denied, the writ previously issued is quashed, and the case is remanded to the Superior Court for further proceedings.