## No. 24635

**Donald Anthony DeLuzio v.**
**The People of the State of Colorado**
(494 P.2d 589)

Decided March 6, 1972.

Brenman, Ciancio, Rossman, Baum & Sobol, Leo T. Zuckerman, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, E. Ronald Beeks, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

Donald Anthony DeLuzio, hereinafter referred to as the "defendant," was convicted by a jury of the crime of conspiracy. Following the jury verdict, a motion for a new trial was made on the basis of newly discovered evidence. The motion was denied after an evidentiary hearing, and sentence was then imposed. Thereafter, the defendant prosecuted this appeal, alleging that various errors occurred which dictate reversal. One error that is alleged is so pernicious that reversal is mandated.

The defendant, according to the evidence, enlisted the services of Steve Maestas and Nick Lopez to perpetrate and carry out the robbery of the Los Angeles Diamond Exchange. The jewelry store in question was located in The University Building and was owned by Elmer Cohen, whom the

defendant had known for several years and with whom the defendant had conducted various business transactions. The defendant's complicity in the robbery was established beyond a reasonable doubt if Steve Maestas and Nick Lopez were considered to be credible witnesses by the jury.

Some time after 9:00 a.m. on May 15, 1969, Meastas and Lopez entered the jewelry store heavily disguised and armed with pistols. At gunpoint, the owner of the jewelry store opened his safe, which contained $15,000 to $20,000 in diamonds, jewelry, and cash. The contents of the safe were placed in a bag by Lopez and Maestas, and the owner was bound and gagged before the defendants fled. The owner, however, was able to free himself and called for help, which resulted in the almost instantaneous apprehension of Maestas and Lopez.

DeLuzio was seen in the immediate area just after the robbery was committed and was stopped by a police officer at the time, but was not taken into custody after a police officer ascertained from police headquarters that no charges were pending at the time against DeLuzio. Some time later, in the Denver County Jail, Lopez and Maestas gave statements to the police which implicated DeLuzio as a co-conspirator in the crime. DeLuzio was then arrested and charged with the crimes of robbery and conspiracy to commit robbery.

Admittedly, the prosecution could not prove its case against DeLuzio unless the testimony of Maestas or Lopez was obtained. Both Lopez and Maestas had been caught redhanded and were more than willing to testify against DeLuzio in exchange for dismissal of certain charges and concessions on a sentence. Charges were then pending against Lopez and Maestas for the crimes of robbery, conspiracy, and for a felony relating to possession of a gun by a felon. In addition, other criminal charges ranging from burglary to narcotics, were also pending against Lopez and Maestas, who both had police records with felony convictions. Trial of the robbery and conspiracy charges against Lopez and Maestas was to be held two days after the defendant's trial.

In the course of the defendant's trial, both Maestas and Lopez testified and offered the evidence that established that the robbery had been planned at DeLuzio's home on May 14, 1969. Maestas and Lopez also told the jury that DeLuzio had given them the layout of the jewelry store and the pistols which were used in the robbery. They further linked DeLuzio to the illicit activity by testifying that DeLuzio drove them into town in his car and stopped so that they could obtain ammunition for one of the pistols and surgical tape to tie up the owner of the diamond exchange. The plan, according to Lopez and Maestas, was for DeLuzio to remain in the car in front of Joslin's department store, which is adjacent to The University Building, so that an escape could be made. The owner's immediate alarm, however, caused the police to be on the scene before DeLuzio could fulfill his function as driver of the get-away car. As a result, when Maestas and Lopez were arrested, DeLuzio got out of his car and was walking away from the scene when he was stopped by police officers. DeLuzio was not tied in to the crime by the testimony of any other witness, other than the wife of Maestas, who told the jury that she had talked to DeLuzio after the abortive robbery to obtain bail for both Lopez and Maestas.

Lopez told one of his fellow inmates at the county jail of the deal which had been made to obtain his testimony and of the plea bargain which he had made to have a series of charges dismissed in exchange for "burning" DeLuzio, whose extensive criminal record and activities were known to the police. The inmate's conversation with Lopez was reported to DeLuzio by the inmate. Defense counsel, as a result, brought the conversation to the attention of the court and sought a continuance to determine the accuracy of the inmate's story. When the continuance was denied, defense counsel asked both Maestas and Lopez, on cross-examination, whether any promises had been made or a deal or plea bargain entered into in exchange for their testimony. Both of DeLuzio's alleged coconspirators denied the existence of a deal or a plea bargain, although one had, in fact, been made. The district

attorney who was charged with the prosecution of the case was called to the stand by defense counsel, and he, too, denied that any deal had been made with Lopez or Maestas. During the course of the trial, the chief investigator for the district attorney's office and other officers also denied that a deal had been made.

After DeLuzio was convicted, the district attorney made inquiry, and at the hearing on the motion for a new trial, he was obliged to admit that sentence concessions and dismissals had been agreed to on all charges, except for pleas to a second burglary charge, in exchange for testimony against DeLuzio. The prosecution admitted that the plea bargain was wholly contingent upon the quality of the testimony given by Lopez and Maestas at the DeLuzio trial, and that both men testified under penalty of having their plea bargain cancelled.

Before denying the motion for a new trial, the trial judge heard evidence from the district attorney which proved that the plea bargain had, in fact, been entered into prior to trial. Counsel for Nick Lopez also testified at the hearing on the motion for new trial and said that he had negotiated a plea agreement that provided for a plea to second degree burglary and testimony for dismissal of all charges against Lopez and a sentence to the reformatory, rather than the penitentiary. Lopez's counsel also established that the chief investigator and the chief deputy for the district attorney knew of the deal prior to trial.

Under these circumstances, a new trial should have been granted by the trial court and is now ordered by this Court. Where newly discovered evidence is of such a character as to make it appear that the verdict could have been influenced by false or mistaken testimony and that upon another trial the result might be different, then a new trial should be granted. *Cheatwood v. People,* 164 Colo. 334, 435 P.2d 402 (1967); *Whipp v. People,* 78 Colo. 134, 241 P. 534 (1925).

Even if the district attorney did not know at the time of trial that a deal had been made, he had every reason to

believe that a deal had been made and should have made further inquiry. *Wild v. Oklahoma,* 187 F.2d 409 (10th Cir. 1951). If the district attorney had made inquiry at the time defense counsel first claimed that such an agreement existed, he would not have misled the jury with his false testimony.

■ If the district attorney had known that Lopez and Maestas were offering perjured testimony, this case would fall squarely within the holding of *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In *Napue v. Illinois, supra,* the Supreme Court declared that a due process violation occurred when the district attorney permitted a witness to testify that no deal had been made, when, in fact, sentence concessions had been made, and no effort was made by the prosecution to correct the error. *See also, Mitchell v. People,* 170 Colo. 117, 459 P.2d 284 (1969). Here, a similar due process violation occurred, because the district attorney should have known of the agreement. Certainly, knowledge of the chief deputy and of the chief investigator for the district attorney is knowledge to the entire office. Indeed, in *People v. Martin,* 46 Ill.2d 565, 264 N.E.2d 147 (1970), the court went further and held that the prosecution is charged with the knowledge of its agents, including the police. *Accord, Imbler v. Craven,* 298 F.Supp. 795 (D.C. C.D. Cal. 1969).

■ It is also clear under the Fourteenth Amendment to the United States Constitution and from the decisions of the United States Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); and *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), that the rights of the accused were violated when the prosecution offered perjured testimony and withheld evidence favorable to the accused.

It is too plain for cavil that the testimony of both Maestas and Lopez was perjured as to the plea bargain and was suspect. What action the jury would have taken if the true facts had been made known is to speculate. The jury had deliberated more than ten hours and were deadlocked when

the trial judge inquired of their numerical standing on the charges and gave the Allen or "third degree instruction."

The duty of the district attorney extends not only to marshalling and presenting evidence to obtain a conviction, but also to protecting the court and the accused from having a conviction result from misleading evidence or perjured testimony. Our *Canons of Professional Ethics* then specifically declared that the primary duty of a district attorney is not to convict, but to see that justice is done. Canon 5, *Canons of Professional Ethics,* C.R.S. 1963, Vol. 1, p. 202. *See American Bar Association Standards of Criminal Justice Relating to The Prosecution Function,* §§ 3.11, 5.6.

Plea bargains are now all but uniformly recognized. *See American Bar Association Standards of Criminal Justice Relating to Pleas of Guilty,* § 3.1; *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *Dabbs v. People,* 175 Colo. 273, 486 P.2d 1053 (1971), and the cases cited therein. However, the bargain may not be hidden and must be brought to the surface for scrutiny. *See Santobello v. New York,* 10 Cr.L. 3016 (December 20, 1971).

The guilt of the defendant is obvious if Lopez and Maestas are to be believed. However, the use of false testimony and the unfair tactics which were employed weakens the very foundation upon which our system of justice rests. Truth alone should be the basis for conviction. False testimony, when knowingly used, or when used recklessly or without regard or inquiry as to the truth of the facts asserted, dictates that a reversal occur.

Accordingly, we reverse and remand with directions that a new trial be granted.

MR. JUSTICE LEE not participating.