Otto **GRAHAM**, Petitioner,

v.

William **WILSON**, Superintendent, Centennial Correctional Facility; and the Attorney General of the State of Colorado, Respondents.

**Civ. A. No. 85–K–2372.**

United States District Court,
D. Colorado.

Sept. 30, 1986.

As Amended Oct. 15, 1986.

Vicki Mandell-King, Asst. Federal Public Defender, Denver, Colo., for petitioner.

Virginia Byrnes Horton, Asst. Atty. Gen., Denver, Colo., for respondent.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

## I.

## INTRODUCTION

Otto Graham, an inmate at the Centennial Correctional Facility, Canon City, Colorado, brings this *habeas corpus* action pursuant to 28 U.S.C. § 2254. He attacks the judgment of conviction entered against him on September 17, 1981, in the Fourth Judicial District, El Paso County District Court, Colorado Springs, Colorado. The judgment was affirmed by the Colorado Court of Appeals and then by the Colorado Supreme Court. *See Graham v. People*, 705 P.2d 505 (Colo.1985).

The petition is based on two grounds: (1) that Graham's conviction resulted from perjured testimony knowingly used by the prosecuting attorneys which therefore violated his Fourteenth Amendment right to due process; and (2) that the trial court's denial of Graham's motion for a new trial based on newly discovered evidence violated his Fourteenth Amendment rights to due process and equal protection.

## II.

## PROCEDURAL BACKGROUND

Petitioner Graham was convicted of nine counts of aggravated robbery, three counts of first degree sexual assault, one count of aggravated motor vehicle theft, and three counts of a crime of violence in connection with rapes and robberies at three fastfood restaurants (two Taco Bells and a Der Weinerschnitzel) in Colorado Springs, Colorado. Graham was sentenced to 131 years in prison. Because concurrent time is to run on some counts, his actual sentence is for a term of 80 years.

Graham filed two motions for a new trial. Hearings were held on these motions on October 23, 1981 and on several dates

from May 28, 1982 through August 26, 1982. The motions were based on newly discovered evidence which Graham alleges was the perjured testimony of prosecution witness, Robert Reddick. Reddick had perjured himself when he stated he (Reddick) had no agreement with the district attorney's office for his testimony against Graham. As it turned out, Reddick received immunity for various charges pending against him in exchange for his testimony against Graham, as well as against other defendants unrelated to this action. *See Graham v. People, supra.*

After hearing testimony on Graham's motion for new trial, the district court denied the motion. Although the court concluded Reddick's agreement required him to testify against Graham, it stated because of "confusion" in the district attorney's office, Reddick himself became confused and uncertain of the agreement's requirements. The court then concluded the evidence against Graham was, in any event, "overwhelming", apart from Reddick's testimony. The court further concluded the jury had been "made aware" of the agreement such that any further evidence of the agreement would have been cummulative. The defense attorneys suggested a plea arrangement existed but Reddick denied it and the prosecuting attorneys did not correct Reddick's perjured testimony. Finally, the district court stated Reddick's agreement with the district attorney's office could not be correctly deemed "newly discovered evidence" since Graham's lawyer had a copy of the police report outlining this agreement before trial (as did the prosecuting attorneys).

The Colorado Court of Appeals affirmed Graham's convictions and the denial of the motion for new trial in an unpublished opinion (case No. 81–CA–1130) stating Graham had failed to meet the requirements for a new trial based on newly discovered evidence because

> he [Graham] knew or could have discovered with diligence the existence of the agreement at the time of trial, and that further evidence regarding the agree-

ment with Reddick would have been "merely cumulative and impeaching".

*Graham* at 508.

The Colorado Supreme Court granted certiorari on February 14, 1984. The Court concluded the prosecution's allowance of Reddick's testimony concerning the non-existence of a plea arrangement requiring testimony against Graham was harmless beyond a reasonable doubt under the facts of the case. *Graham,* at 509. The Supreme Court stated:

> although the prosecution's use of this testimony, if false, would constitute reversible error if there were a reasonable possibility that it contributed to the jury's verdict, we conclude that the testimony was harmless ...

*Graham,* at 510.

Petitioner Graham is now serving his sentence at the Centennial Correctional Facility in Canon City, Colorado and brings this collateral attack on the state court judgment to federal court under a writ of *habeas corpus.* Pursuant to Rule 605 of the Local Rules of Practice of the United States District Court for the District of Colorado, this action was first referred to Magistrate Richard B. Harvey. On June 24, 1986, the Magistrate submitted a Recommendation of Dismissal which essentially agreed with the conclusions of the Colorado Supreme Court and the District Court in Colorado Springs, Colorado. In response, the petitioner filed objections thereto. The matter is now before me for ruling.

### III.

### TESTIMONY OF WITNESSES

#### A. PATIENCE EASTERBROOK.

Patience Easterbrook (now Jacoby) testified for the prosecution that on the evening of August 19, and August 20, 1980, she was working as the night manager at a Taco Bell Restaurant on North Union Boulevard in Colorado Springs, and was sexually assaulted that evening by a man with a gun who also robbed her and the restaurant. (Trial Record, pp. 227–228, 243, 248,

249. Hereinafter all references to the Trial Record will be made with page numbers).

Mrs. Jacoby did not get a good look at the assailant. (p. 262). Mrs. Jacoby stated she was unable to make identification of the man who assaulted her from the physical features she was able to observe during the incident. (p. 269). She then stated she was able to make identification. (p. 279).

On cross-examination, she stated she viewed one-half of her assailant's face for about one second. (pp. 285, 286). Mrs. Jacoby admits that on November 14, 1980, she testified in a preliminary hearing in a case in which a Mr. Carlos Byron was charged as being her assailant on the evening of August 20, 1980. (pp. 288, 289). She admitted that on February 12, 1981, she viewed a physical line-up at the sheriff's office and that even though Otto Graham was in that lineup, she failed to pick him out and, instead, picked a Donnie Hall as looking familiar, but she could not be positive. (pp. 289, 290).

On redirect examination, she stated that among the people present in the courtroom, Graham was the most consistent to the characteristics of her assailant which she described. On re-cross examination, however, she admitted she had testified at Carlos Byron's preliminary hearing she had no doubt Carlos Byron was her assailant. (pp. 332, 333).

## B. JEFF KETCHUM.

Jeff Ketchum testified for the prosecution he worked with Patience Jacoby at the Taco Bell Restaurant the night of August 19, 1980, but he never did see the assailant's face because the assailant wore a mask. (pp. 376, 377).

Mr. Ketchum remembers viewing the physical lineup at the Sheriff's office on October 7, 1980, and admits he picked out Carlos Byron and a Steve Johnson as looking most like his assailant, and that he would probably go with Johnson. (p. 400).

## C. KATHLEEN MING.

Kathleen Ming testified for the prosecution that on August 29, 1980, she worked at the Taco Bell Restaurant on East Fillmore Street, and was sexually assaulted by a man with a gun who also robbed her and the store. (pp. 414, 415, 448, 450, 478). She identified Graham as her assailant (she noticed he had a scar or a piece of skin hooking his nostril to his cheek and had extremely long fingernails). (pp. 453, 454, 458). Miss Ming admitted she attended the preliminary hearing of Carlos Byron and she positively identified him in court as being her assailant. (pp. 483, 483).

Ms. Ming attended a physical lineup on February 8, 1981, and identified Graham as her assailant. (pp. 485, 486). Shortly after the incident occurred, she told an investigating police officer her assailant was five-foot-nine to six feet tall. (p. 494). On cross examination, Miss Ming admitted that on September 30, 1980, she was shown a photograph of the lineup and she picked out Carlos Byron as being her assailant. (She told the police that on a scale of one to ten, Carlos Byron was an "eight" in terms of her certainty that he was her assailant). (p. 498). Miss Ming stated that on October 7, 1980, she attended a physical lineup and she picked out Carlos Byron from that physical lineup. (p. 501). She stated that at Carlos Byron's preliminary hearing she could have testified she was "very certain" of her selection of him as her assailant. (p. 502). At Carlos Byron's preliminary hearing she also testified she picked Byron out of the lineup and the certainty of her selection of him was a "ten" on a scale of one to ten. (pp. 502, 503).

## D. MARK SURABIAN.

Mark Surabian testified for the prosecution that on August 29, 1980, he worked at the Taco Bell on Fillmore Street with Kathleen Ming, that he did not have his glasses on that evening, and that his eyes are not good without his glasses on. (pp. 511, 541, 542).

On cross examination, Surabian admitted he identified Carlos Byron as the assailant at a physical lineup. (p. 549). He also admitted he told the police first the assail-

ant was a "dark-skinned Negro", then, later told them the assailant was a "light-skinned Negro". (p. 555). Surabian admitted he picked out Carlos Byron from a photo lineup and said he was an "eight" on a scale of certainty of one to ten. (p. 556). Surabian further admitted that on October 7, 1980, he viewed a physical lineup and picked out Carlos Byron as being the assailant and stated he was "absolutely positive, no doubt in [his] mind" that Byron was the assailant. (p. 448). Surabian also admitted he picked Carlos Byron out as the assailant a third time at Byron's preliminary hearing. (p. 559).

### E. PEARL GARCIA.

Pearl Garcia testified for the prosecution that on September 27, 1980, she was working at the Der Wienerschnitzel Restaurant on North Circle Drive in Colorado Springs and was sexually assaulted by a man with a gun who also robbed the store. (p. 591, 592, 601–603, 611). She saw the man without his mask on when he took it off to kiss her. (p. 620). The man, according to her, was only about five-foot-two or five-foot-three and weighed about 135 or 140 pounds. (p. 620). Pearl Garcia admitted that at a photographic lineup, she "positively identified" the picture of one Quinton McClinton as her assailant (p. 623). She attended a physical lineup in February of 1981. Otto Graham was in that line up but she made no identification of him. At trial, however, she stated that had she known the men in the lineup were allowed to shave, she would have picked Graham. (p. 624). At trial she identified Graham as her assailant. (p. 629).

On cross examination, Ms. Garcia stated the photo lineup wherein she picked out Quinton McClinton as her assailant was shown to her about two days after the incident. (pp. 633, 634). Shortly after the photographic lineup in which she positively identified McClinton as her assailant, she was at the Colorado Springs Police Investigation Bureau when she saw McClinton being escorted to the station by the police. When she looked at him she thought he

was the man who raped her and she became very upset. (p. 641).

### F. MARIA SANCHEZ.

Maria Sanchez testified for the prosecution that on September 27, 1980, she went to the Der Wienerschnitzel Restaurant on North Circle Drive in Colorado Springs to pick up her daughter, Pearl Garcia. She saw Pearl on the floor with no clothes on and a black man was pointing a gun at her and her young daughter, Valerie. The man took Maria Sanchez' purse, car keys, and told her to take her clothes off. (pp. 542–646). The man had nothing over his face. (p. 648).

She attended a physical lineup in which Graham was a participant, but she made no identification of him at that lineup. (p. 653). At trial, Mrs. Sanchez identified Graham as her assailant. (p. 654, 655).

On cross examination, Mrs. Sanchez stated that after the photographic lineup, approximately two days after the incident, she was in the parking lot behind the Police Investigation Bureau when she saw the police bringing a man out of a police car. She looked at him and became hysterical. She went to Detective McCleary and told him that that was the man who assaulted her. That man was not Otto Graham, however, it was Quinton McClinton. (pp. 660, 661).

### G. OTHER WITNESSES.

David Duron and Valerie Sanchez testified for the prosecution that they were at the Der Wienerschnitzel Restaurant the evening of September 27, 1980, and were also victims of a robbery committed by a black man with a gun. At trial they identified Graham as their assailant. (pp. 670, 684, 709–712).

Officer Donald English testified for the prosecution he interviewed Pearl Garcia after the assault and she told him her assailant was approximately six feet tall. (pp. 723, 726). She had previously said he was five-foot-two or five-foot-three.

Dale Kahre testified for the prosecution he worked with Pearl Garcia the evening of September 27, 1980. (p. 735). He identified Graham at a physical lineup in February of 1981 (p. 762).

Rudy Diehl testified for the prosecution he was manager of the Der Wienerschnitzel restaurant on Circle Drive on September 27, 1980, and on the premises that evening. He identified Graham in the courtroom and at a physical lineup in February of 1981. (pp. 877, 906, 909).

Keith Cross testified for the prosecution he is a deputy district attorney and he prosecuted Carlos Byron in Division 9 of the El Paso County District Court for the same crimes Graham is not charged with. (p. 962). Cross stated that at Byron's preliminary hearing, Kathy Ming, Patience Jacoby, and Mark Surabian, all identified Byron as being their assailant with no qualification. (p. 974).

## H. ROBERT REDDICK.

At trial, Reddick testified for the prosecution he was driving around with Graham on the nights of the two Taco Bell robberies and dropped Graham off at the restaurants when Graham decided to rob them. Reddick stated Graham later told him (Reddick) that he (Graham) committed the rapes during the course of the robberies. Reddick further testified he refused to participate the night the Der Weinerschnitzel was robbed, but he knew Graham intended to rob the restaurant and Graham called him later requesting a ride because a Volkswagon Graham was driving had broken down. Witnesses testified the robber left the Der Weinerschnitzel in a Volkswagon belonging to one of the robbery victims. The Volkswagon, which had a faulty carburetor, later was found abandoned on the street.

On cross- and re-direct-examination, Reddick stated he had not agreed to testify against Graham as part of an agreement with the police or district attorney in order to dismiss charges against him. In defense, Graham called police Detective Eldridge, who testified that eight charges

had been pending against Reddick at the time Reddick informed on Graham. He further testified when Reddick offered information about who committed the three rape-robberies, a deputy district attorney authorized Reddick's immunity against prosecution for the three incidents as long as Reddick had not personally participated in the rapes. Eldridge went on to testify Reddick accepted an agreement that the bond for his pending charges would be reduced and all charges would be dropped if he testified truthfully regarding the unrelated four robberies with which he had been charged *and the three rape-robberies allegedly committed by Graham.*

In rebuttal, the prosecution presented another police detective, who testified he made the first agreement to drop Reddick's charges before he knew of Reddick's information about the rape-robberies. He also testified that later in the same interview with Reddick, Reddick told him about the rape-robberies. The police detective testified further, however, that he (the detective) was not present during all of detective Eldrige's interview with Graham which Eldrige had testified resulted in Reddick's agreement to testify against Graham.

At the hearing on the motion for new trial, the two police detectives again testified an agreement was made with Reddick to drop the charges against him in exchange for testimony against his co-defendants in his own cases, and against Graham in the case involving the rape-robberies. They testified further the district attorney's office approved the agreement. Reddick's lawyer testified the testimony against Graham was one of the elements of the bargain Reddick made with the police and the district attorney's office. The deputy district attorney who tried the case against Graham testified he did not know the arrangement with Reddick required Reddick to testify against Graham. A copy of the report outlining the plea agreement was in the deputy district attorney's file before the trial ever began. Reddick's response to being questioned about any plea bargaining agreement was: "Naw (phonet-

ic). They didn't give me no deal to testify here in this courtroom." (p. 1042).

## IV.

## PETITIONER'S OBJECTIONS TO THE RECOMMENDATION OF THE UNITED STATES MAGISTRATE

Petitioner Graham has based this *habeas corpus* action on two related but different grounds: 1) the conviction resulting from perjured testimony known by the district attorney's office violated the due process clause and right to a fair trial guarantee of the constitution; and, 2) the denial of the motion for new trial based on newly discovered evidence violated the due process and equal protection clauses of the constitution. The United States Magistrate has recommended that this petition for writ of *habeas corpus* be denied on both grounds. For the reasons stated below, however, I find petitioner's objections to the Magistrate's recommendation valid and therefore grant the petition.

## A. THE KNOWING USE OF PERJURED TESTIMONY BY THE DISTRICT ATTORNEY'S OFFICE.

### 1) *The Constitutional Magnitude of Petitioner's Objection.*

Petitioner Graham asserts his conviction resulted from the perjured testimony of prosecution witness, Robert Reddick.

■ When reviewing this petition for writ of *habeas corpus,* I must determine whether petitioner's conviction was obtained in violation of some provision of the United States Constitution. Federal Courts have no supervisory authority over state judicial proceedings and thus may intervene only to correct state action which is of constitutional magnitude. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

> Before a federal court may overturn a conviction resulting from a state trial ... it must be established not merely that the [state's action] is undesirable, erroneous, or even "universally condemned", but that it violated some right which was

guaranteed to the defendant by the Fourteenth Amendment.

*Smith,* at 221, 102 S.Ct. at 948 (*quoting Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)).

■ One of the aims of due process clause of the Fourteenth Amendment to the Constitution is to avoid an unfair trial to proceed against the accused. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It is firmly established a conviction which is obtained through the use of false evidence or testimony, known to be such by the prosecution, is a denial of due process and in violation of the Fourteenth Amendment. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Jones,* 730 F.2d 593 (10th Cir.1984). Perjury is defined as knowingly and willfully giving false testimony relating to a material matter. *Jones,* 730 F.2d 593, 597. The credibility of a witness is a "material matter". *Napue, supra.*

Thus, petitioner's objection is of constitutional magnitude; however, in order for Reddick's perjured testimony to constitute grounds for the grant of the petition, Graham must further demonstrate "there is [a] reasonable likelihood that the false testimony could have affected the judgment of the jury". *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Avery v. Procunier,* 750 F.2d 444 (5th Cir.1985); *Smith v. State of Oklahoma,* 418 F.Supp. 907 (W.D.Okla.1976). This further showing is part of the Tenth Circuit's three-pronged test for setting aside a conviction based on perjured testimony. Applying that test, I will consider each component as it relates to the instant case.

Before I do this, however, I note *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), which requires a federal habeas corpus court to:

> "independently apply the correct constitutional standard to the historical facts underlying [the] claim, no matter how

fairly and completely the claim has been litigated in the state courts."

2) *The Test In This Circuit To Determine Whether Perjured Testimony May Provide Grounds For Setting Aside A Conviction.*

■ The test to determine whether perjured testimony may provide grounds for setting aside a conviction is that the petitioner must establish: 1) the testimony was false; 2) it was knowingly and intentionally used by the government to obtain the conviction; and, 3) it was material. *Smith,* 418 F.Supp. at 908 (*quoting Mcbride v. United States,* 446 F.2d 229 (10th Cir. 1971)).

a) *The testimony was false.*

It has already been established that the testimony was, indeed, false. Reddick had been in custody at the El Paso County Jail in December of 1980 and was charged for aggravated robbery in four separate cases—the charges were later dismissed pursuant to the plea agreement concerning testimony against Graham. Mr. Landsberg, who represented Reddick, testified a plea agreement was reached between Reddick and district attorney Martin (Trial Record, vol. X, pp. 32–33). Thus, it is clear Reddick gave false testimony when he denied any agreement had been reached. Moreover, the district attorney allowed this false testimony to stand as the truth.

Although the magistrate has stated in his recommendation that "there was much confusion between all parties involved as to the exact extent of Robert Reddick's plea bargain agreement with the District Attorney's office", it is nevertheless clear to me Reddick was not totally oblivious to the fact that a plea arrangement had been reached or was, at least, in the works and it would require him to testify against Graham as well as other defendants involved in the four other crimes as part of the said arrangement.

The plea arrangement transpired in the following manner: Detective Eldridge testified Reddick told him he knew who committed the rapes and robberies at the two Taco Bells and a Der Weinerschnitzel. Eldridge discussed this matter with deputy district attorney Cross who *authorized immunity for Reddick* so long as he was not involved in the actual rapes. Eldridge stated there *was no doubt in his mind that Reddick understood he would have to testify against various persons.* (Trial Record, vol. X at 15–16). "Various persons" meaning Graham and other co-defendants in four other crimes with which Reddick was involved.

Now for the alleged confusion, Robert Harward, who was the deputy district attorney and co-counsel at Graham's trial, testified it was his understanding that Reddick was given *only* immunity for testifying against Otto Graham. (Trial Record, Vol. X, p. 44). Neither he nor Graham's counsel, Tom Barton, were allegedly aware of the Colorado Springs police report by Detective Eldridge which outlined the plea agreement, although both had this report in their files at the time they went to trial. (Trial Record Vol. X, pp. 45–49, 68–71).

Mr. Landsberg, Reddick's lawyer, further stated that to his knowledge, the agreement was not limited to testifying only against a Mr. Johnson, Reddick's co-defendant in the four other cases, and that he really did not know exactly everyone the agreement was supposed to cover (Trial Record, Vol. X, p. 38). But again, he knew, at least, it was supposed to cover Graham. He further stated at the hearing he had discussed this deal with Reddick (pp. 38–41). Reddick's bond was subsequently reduced which enabled him to make bail, and, in April of 1981, the four cases were dismissed against him.

It is clear that the testimony was false, the magistrate's concern with "confusion over the arrangement" notwithstanding. The Colorado Supreme Court stated the constitutional concerns raised by the use of false testimony as follows:

> Reddick's testimony denying an agreement to testify against Graham, if false, violated Graham's right to a fair trial under the Fourteenth Amendment to the

United States Constitution. *DeLuzio v. People,* 177 Colo, 389, 494 P.2d 589 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

*Graham* at 508.

This constitutional violation is not some mere "technicality" with which I should not be too concerned. False testimony, even if it "only" goes to the credibility of the witness, is of the utmost importance. As the United States Supreme Court stated in *Napue v. Illinois:*

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes *only to the credibility of the witness.* The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon which subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. (emphasis added).

*Graham* at 508, n. 3.

It is clear there was a plea agreement between Reddick and the district attorney. Moreover, it is obvious it included, at a minimum, testimony against Graham. For Reddick to lead the jury to believe there was no plea arrangement involving the exchange of immunity for his testimony against Graham (and others) was an outright lie. For the deputy district attorneys knowingly to allow such perjury to stand uncorrected is the issue to which I turn next.

b) *The testimony was knowingly and intentionally used by the government in order to obtain the conviction.*

Petitioner objects to the way in which the United States Magistrate applies the second prong of the Tenth Circuit's three pronged test: knowingly and intentionally using perjured testimony in order to obtain the conviction. The magistrate stated in his recommendation:

There is no showing by the petitioner that the prosecution knowingly and intentionally used this purported perjured testimony. *See Smith,* 418 F.Supp. at 908–909. Furthermore, both the petitioner's attorney Mr. Barton and prosecutor Harward had copies of Detective Eldridge's report outlining this agreement with Reddick. However, neither of them read it prior to trial.

Recommendation of United States' Magistrate, at pp. 6–7.

Petitioner argues the prosecuting attorneys knew Reddick's denial of a plea arrangement was, in fact, perjured testimony, or, at least, they should have known. I, however, do not need to make a factual determination concerning the actual knowledge of the attorneys in this case. The correct standard of law on this point is stated by the Colorado Supreme Court in *Graham,* 705 P.2d 505, 508

It is irrelevant that the deputy district attorneys who prosecuted the case had no actual knowledge of the agreement because they had possession of the same police report that informed the defendant of the agreement and other members of the District Attorney's office were aware of the agreement. The knowledge and actions of deputy district attorneys are imputed to the district attorney, *Corr v. District Court,* 661 P.2d 668, 672–73 (Colo.1983), *People v. Castro,* 657 P.2d 932 (Colo.1983), and may also be imputed to other agents of the district attorney, who "function only by virtue of the district attorney's authority ..." *Corr,* 661 P.2d at 673. *Cf. Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (assistant U.S. attorney responsible to know of promises given informant by another assistant U.S. attorney).

*Graham* at 508.

▆ The Colorado Supreme Court then dropped a footnote to explain the imputed knowledge of one attorney to the other in the district attorney's office. Thus, the fact that the attorneys in this case may not have read their file on the case before trial is not determinative for the "knowingly

and intentional use of perjured testimony" standard.

> We here impute the knowledge of one deputy district attorney who investigated this case to another deputy district attorney who prosecuted it. Under other circumstances, the knowledge of each deputy district attorney may not be imputed to every other deputy district attorney in the district. *See Cleary v. District Court,* 704 P.2d 866 (Colo.1985). *In the present situation, however, both deputy district attorneys exercised substantial control over the prosecution of the case, so the knowledge of each is imputed to the other.* (emphasis added).

*Id.* at 508.

The court goes on to say:

> The prosecution's use of false testimony "recklessly or without regard or inquiry as to the truth of the fact asserted" violates a defendant's rights to due process and requires reversal of his conviction. *DeLuzio,* 177 Colo. at 396, 494 P.2d at 593.

*Id.*

██ Given this correct standard of law, the district attorneys knowingly and intentionally used perjured testimony in order to obtain the conviction. They were aware a plea arrangement of some sort had taken place involving immunity and testimony against Graham, they had substantial control over the case, and finally, a copy of the plea agreement was in their file before trial. Although prosecutor Harward allegedly did not read the file before the trial, ignorance is no excuse. Moreover, I do not plan to send a message to district attorneys which would have them believe that if they do not read certain documents in their criminal files—such as plea bargaining agreements of star witnesses given in exchange for their testimony—then they will not be responsible at trial for the information contained therein. Actual knowledge on the part of the prosecutor is not determinative; on the other hand, the fact that the prosecutors should have known Reddick's testimony was perjury, is determinative.

The United States Magistrate seems to want it both ways when it comes to this issue of actual knowledge versus constructive knowledge. On the one hand, the magistrate agreed with the Colorado Court of Appeals and Colorado Supreme Court in denying the motion for a new trial based on newly discovered evidence because petitioner's counsel:

> "knew or could have discovered with diligence the existence of the agreement at the time of trial ..."

*Graham* at 508.

Yet, on the other hand, when Graham argues the prosecuting attorneys "knew or, at least, should have known" of the plea agreement and being so responsible denied petitioner the right to a fair trial by allowing the perjured testimony to go uncorrected, the United States Magistrate invokes an actual knowledge test. He does not apply the same standard of knowledge ("knew or could have discovered with diligence") to the petitioner that he allows the district attorneys. If petitioner was responsible for discovering the information available before trial, then the district attorneys should also be equally responsible for the same information available before trial.

### c) *The testimony was material.*

The Colorado Supreme Court and the United States Magistrate, in upholding the conviction of petitioner, rely heavily upon the notion that the perjured testimony, "was harmless beyond a reasonable doubt". They found:

> The testimony of Mr. Reddick was merely corroborative to that of the other witnesses and the omitted facts of the scope of his agreement with the District Attorney's office do not meet the requirements of being "material" evidence which would deprive petitioner of a fair trial.

Recommendation of the United States Magistrate, p. 7.

██ The standard for materiality requires petitioner to demonstrate that had the omitted evidence (the truth about Red-

dick's plea bargaining arrangement) been disclosed, petitioner would not have been found guilty.

> The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.... The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt beyond guilt whether or not the additional evidence is considered, there is no justification for a new trial. [Footnotes omitted.]

*United States v. Agurs*, 427 U.S. 97, 109–10, 112–13, 96 S.Ct. 2392, 2400, 2401–02, 49 L.Ed.2d 342 (1976). *See also Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

When the testimony of all the witnesses, except Reddick, is taken into account, it is clear a reasonable doubt would exist as to whether or not Graham is guilty. There were just as many witnesses identifying Carlos Byron as the assailant as there were witnesses identifying Graham. Furthermore, other witnesses identified other individuals as their assailant (Quinton McClinton and Steve Johnson, for example) with the same amount of assurance (and often more in some instances) as those identifying Graham.

The reason I set out the testimonial summaries of each of the eye witnesses with such detail is to demonstrate the reasonable doubt existing as to Graham's guilt (*See* Part III, *supra*). These misidentifications and various failures to identify Graham raise an obvious reasonable doubt. What is most troubling about these identifications is that, according to these witnesses, Carlos Byron or Clinton McClinton could have just as easily been convicted for the rape robberies for which Graham was ultimately convicted.

There is a very important reason, however, why Graham, and not these other individuals, was convicted—because of the testimony of Robert Reddick. It was Reddick's testimony which puts Graham at the site of the crimes, identifies Graham with the assailant's vehicle, and gives direct proof to the assumption that Graham is definitely the assailant. Reddick's testimony essentially removes Graham out of the category of reasonable doubt (misidentifications, unreliable and conflicting testimony) and places him into the category of guilty beyond a reasonable doubt (Reddick was a personal friend of Graham's, he gave an unmistaken and reliable identification, he would have no reason to lie, etc.).

Thus, Reddick's testimony is crucial, however, Reddick perjured himself. Not only does the perjury, in and of itself, call into question Reddick's credibility; but what he lied about removed all the apprehensions a juror may have had in believing the whole of his testimony. As stated earlier, perjury and credibility of witnesses are issues of constitutional dimension when a federal habeas court is reviewing a state conviction.

The reason why constitutional error was committed in this case is because the jurors were misled about Reddick's credibility to such a degree that this perjury cannot be called mere "harmless error". The jurors had no reason to call into question Reddick's credibility, however, had they been aware of the fact that Reddick had the inducement of having all charges dropped against him in four non-related burglary and assault cases and the immediate inducement of being allowed to go free on reduced bail rather than to remain detained in jail, they would have had to reassess Reddick's credibility. To make this determination concerning the jurors' assessments of Reddick's credibility had they known all the facts, I do not have to decide whether or not Graham was, without ques-

tion, innocent. All I must decide is if there was a constitutional error in the proceedings such that Graham was denied due process and the right to a fair trial and whether that constitutional error was so substantial it was responsible for the conviction.

Since the testimony which convicted Graham was given by a witness who perjured himself with the knowledge of the prosecuting attorneys, Graham's conviction was unconstitutional in that it violated his Fifth and Fourteenth Amendment rights to due process and his Sixth Amendment right to a fair trial. Although conflicting evidence was offered at trial suggesting Reddick did receive a plea bargaining arrangement for his testimony, the fact that this was not made clear to the jurors by Reddick's perjury or by the prosecuting attorneys is what requires reversal. Mere assertions on the part of the defense attorneys that a plea arrangement existed, despite Reddick's denial on the witness stand and the prosecuting attorneys' complicity, is fundamentally different than if Reddick had forthrightly admitted his testimony was in exchange for the charges being dropped against him as was the case.

Thus, Graham's petition for writ of *habeas corpus* must be granted since he has successfully satisfied the three-pronged test of the Tenth Circuit for determining whether perjured testimony provides grounds for vacation of a conviction. Since Graham's petition is granted on this issue, I do not need to reach the issue of whether the trial court's denial of Graham's motion for a new trial based on newly discovered evidence violated his Fifth and Fourteenth rights to due process and equal protection. A new trial is obviously required.

IT IS THEREFORE ORDERED THAT:

1. The petition is granted.

2. The attorney general shall provide petitioner with a new trial on or before January 1, 1987 or secure petitioner's release from the sentence he is serving for these convictions.

3. Should a valid notice of appeal be filed in time, a stay of execution of this order pending appeal will enter without further application.