DECISION
On June 10, 1997, the Attorney General of the State of Rhode Island (hereinafter "the State," "State" or "Petitioner") brought the within "Motion For Disqualification of Counsel" seeking to disqualify Attorney Gerald Coyne (hereinafter "Coyne" or "Respondent") from further representation of Woloohojian Realty Corporation (hereinafter "WRC"), Woloohojian Realty Association, Inc., (hereinafter "WRA") Harwol Properties, Inc., (hereinafter "HP") and Harwol Construction Co., Inc., (hereinafter "HCC"), [hereinafter referred to collectively as "the entities"].
The state alleged that Coyne, while employed with the Rhode Island Department of the Attorney General during the period April 17, 1988 to January 3, 1994, ". . . worked with the Department of Environmental Management and the State Police Financial Crimes Unit in investigating "WRC," "HCC," and Fayerweather Construction Company, Inc., as well as their principals.
The state further alleged that, "(A)s a direct result of the confidential attorney client relationship that existed between the state and Assistant Attorney General Coyne, Coyne acquired certain information regarding an investigation then pending, which continues to this day in its presentation to the Statewide Grand Jury." "As an Assistant Attorney General, Coyne had access to confidential information about the state's investigation of `WRC,' `HCC,' and Fayerweather Construction Company, Inc., et al." "Coyne now represents `WRC,' `HP,' and `HCC' . . . ." "He is co-counsel with Attorney William Devereaux."
The state argues that, "Coyne, if allowed to continue to represent the parties and entities that he currently represents, is and has been in violation of Rules 1.9 and 1.11 of the Rhode Island Rules of Professional Conduct as those rules relate to a former client here the state."
In support of its Petition, the state attached the following to the Petition filed in this matter:
(A) three (3) subpoenae duces tecum each dated April 1, 1992, to the keeper of the records of"WRC," "HCC," and to Fayerweather Construction Company;
(B) correspondence dated April 10, 1992, from the attorney then representing "WRC" and "HCC" addressed to Coyne in response to the subpoenas referred to above;
(C) redacted copies of; (1) Inter-office memorandum from David N. Thatcher, Office of Criminal Investigation, Environmental Management, to Coyne dated May 20, 1992, concerning the subpoena to "WRC" and "HCC"; (2) to Chief Martin A. Cappelli, Office of Criminal Investigation, Environmental Management, dated March 9, 1993, concerning "updated status on the investigation into unlawful disposal of solid waste by Fayerweather Construction Company . . . involving various Section 8 housing developments located in R.I."; (3) memorandum from Coyne to Martin A. Cappelli, Office of Criminal Investigation of Environmental Management, dated December 29, 1993, concerning "review of Pending Cases," which listed as item number 35 Lester Fayerweather, Sr., that indicated that, "Defense Counsel submitted lab results regarding analytical test alleged to be solid waste. Results showed high concentration of Portland Cement . . . . Awaiting response."
(D) "Petitioners Motion for Return of Seized Property" filed by Coyne on behalf of "WRC," "WRA," "HP," and "HCC" in Third Division District Court on or about May 30, 1997, resulting from a search of property pursuant to a warrant issued for "WRC," "WRA," "HP," and "HCC";
(E) Letter from Coyne to Assistant Attorney General James W. Ryan dated May 23, 1997, concerning "Return of Copies of Seized Documents Re: `WRA' et al.";
(F) Letter to Coyne from Attorney General Pine dated June 2, 1997, which states in part, ". . . request(ing) that you terminate all such representation of `WRC,' `WRA,' `HP,' and `HCC' forthwith";
(G) Letter from Coyne to Attorney General Pine dated June 4, 1997, which in substance declined the Attorney General's request to terminate Coyne's representation of the parties identified in (F) above.
TRAVEL
Following the filing of this Petition, based upon the representation by the Attorney General's office that the issue involved touched upon and concerned a current investigation being presented before the Statewide Grand Jury, the court, pursuant to Rule 6(e) of the Rules of Criminal Procedure, ordered that the file be sealed to preserve the secrecy of the Grand Jury's proceeding.
The court took testimony in closed proceedings, pursuant to Rule 6(e) of the Rules of Criminal Procedure, from witnesses presented by the parties on June 23, 24, 27, and on September 16, 1997, based upon the pending Grand Jury's proceeding as represented by the Attorney General. The following witnesses testified during the proceedings; Respondent Gerald Coyne, Esq., Rhode Island State Police Detective John Killian, and Assistant Attorney General James Ryan. In addition, numerous documents were introduced into evidence by both parties.
Coyne testified that from April 17, 1988 until January 3, 1994, he was employed first as a Special Assistant Attorney General and thereafter as an Assistant Attorney General assigned primarily to prosecute environmental crimes. In addition to these duties Coyne supervised other attorneys who were specifically designated to prosecute a particular environmental matter. Since leaving the Attorney General's Department in January of 1994, he has been engaged in the private practice of law, and on April 21, 1997, in that capacity, he was asked by Attorney William Devereaux to assist him (Devereaux) with the representation of "the entities." Thereafter, on behalf of "the entities," Coyne filed a Motion to Restore Seized Property in Third Division District Court, seized by the Rhode Island State Police from a search pursuant to a warrant. Coyne testified that on June 4, 1997, he received a letter from Attorney General Pine dated June 2, 1997, that according to the letter was precipitated by the filing of the Motion to Restore Seized Property, which in part read as follows:
 "I am requesting that you terminate all such representation forthwith. Our office, the Department of the Attorney General, is a `former client' of yours which you represented . . . ." Most specifically, you worked with the Department of Environmental Management and the State Police Financial Crimes Unit in investigating Woloohojian Realty Corporation, Harwol Construction Co., Inc., and Fayerweather Construction Company, Inc., as well as their principals."
 ". . . (R)edacted copies of numerous memoranda and items of correspondence extracted from our Attorney General investigative file are attached . . . as Exhibit `B."' "As Exhibit `B' indicates, you thereby had access to confidential information about this office and its investigation of `WRC' obtainable only through your service as an assistant attorney general." "In making this request, I am invoking Rules 1.9 and 1.11 of the Rhode Island Rules of Professional Conduct, and the protections afforded us thereunder as a `former client."' (Emphasis supplied.)
Coyne further testified that while employed with the Petitioner he was involved in an environmental investigation involving Lester Fayerweather which specifically alleged the dumping of illegal waste on a vacant lot in the City of Warwick. Coyne testified that he recalled that Fayerweather's then attorney later argued that because of the high concentration of Portland cement in the item dumped that the act did not constitute a violation of the environmental laws and Fayerweather's attorney offered to have the materials analyzed by the Department of Environmental Management (DEM) to prove his point. Coyne testified that he suggested, as an alternative, to clean up the vacant lot in Warwick and dispose of the materials at the Central landfill, but would agree to withhold further action until he received the analysis from DEM. Coyne testified that he forwarded samples of the materials to DEM in the Spring of 1992.
Coyne testified that he had no recollection of receiving a copy of a memorandum addressed to him from David Thatcher dated May 20, 1992, concerning Thatcher's perception of deficiencies in items produced from Grand Jury Subpoenas directed to Woloohojian Realty Corporation and Harwol Construction,[1] or an April 7, 1992 memorandum to Martin Cappelli, Chief, Office of Criminal Investigation, Environmental Management, from David Thatcher, Office of Criminal Investigation, Environmental Management.[2]
Coyne testified that he had a vague recollection of a discussion he had with an attorney then representing Woloohojian Realty Corporation and Harwol Construction concerning production of documents listed in a subpoena duces tecum issued by the Statewide Grand Jury in April of 1992, which was memorialized in redacted form in Exhibit "B."[3]
Coyne testified that he had no independent recollection concerning the contents of a memorandum from Thatcher to Cappelli dated March 9, 1993, the subject being "updated status on the investigation into the unlawful disposal of solid waste by Fayerweather Construction . . . involving various Section 8 housing developments located in R.I."
Coyne acknowledged that on June 11, 1997, he was present, in the anteroom where the Statewide Grand Jury meets to hear testimony, as co-counsel with Attorney Devereaux and a witness, Mr. Pilkaskus, who was scheduled to testify on behalf of "WRC" before the Statewide Grand Jury.
Detective Killian testified that from 1989 until February of 1992 he was employed as a Criminal Investigator with the Department of Environmental Management. He became a member of the Rhode Island State Police in August of 1992, becoming a detective in October of 1994, and was assigned to the Financial Crimes Unit of the State Police in May of 1996. Killian further testified that in April of 1994, the State Police became aware of a Civil Fraud Complaint which had been filed in Kent County concerning individuals related to "the entities," however, he could not say when the State Police investigation of "the entities" commenced. Killian testified that the State Police first became aware of Coyne's involvement with "the entities" on April 21, 1997, when Coyne was present while the State Police executed the search warrant at the offices of "the entities." Killian testified that within two to three days of April 21, 1997, he spoke with Lieutenant Mullen of the Rhode Island State Police to apprise him of Coyne's representation of "the entities" and a possible departmental conflict involving Coyne's wife who is a member of the Rhode Island State Police and was, until she was transferred, assigned to the Financial Crimes Unit.
Killian testified that on June 2, 1997, he met with Assistant Attorney General James Ryan who delivered to him the Attorney General's environmental file (hereinafter "the file") pertaining to the Fayerweather matter. Prior to that day he had not seen the contents of "the file." Killian further testified that before giving him "the file," Ryan reviewed Rule 1.11 of the Rules of Professional Conduct and discussed in general the requirement of the rule. According to Killian, Ryan instructed him to review "the file" to determine if the contents, if known by Coyne, could jeopardize the present Statewide Grand Jury's investigation.
Killian further testified that he first became aware that Coyne was involved in the Fayerweather matter after he reviewed "the file." After reviewing "the file" it was Killian's opinion that since sometime in 1993 Fayerweather has been a target of the investigation, however, that investigation intensified since April of 1997, but that the dumping by Fayerweather of solid waste was no longer the focus of the Attorney General's office in their presentation before the Statewide Grand Jury.
Assistant Attorney General Ryan testified that while Coyne was employed at the Attorney General's Department, he (Ryan) was his supervisor, as Chief of the Criminal Division. Ryan further testified that he became aware of Coyne's involvement in the Fayerweather Construction Company matter by reviewing Coyne's transition memorandum as well as reviewing "the file." Ryan did not have any specific recollection of discussing or interacting with Coyne on the Fayerweather matter while Coyne was employed at the Attorney General's Department. Ryan testified that after Coyne's departure from the Attorney General's Department he was assigned to determine if there was a prosecutable DEM case against Mr. Fayerweather, and he ultimately determined sometime in 1996 that it was not. Ryan further testified that after reviewing "the file," particularly the April 7, 1992 memorandum from David Thatcher to Martin Cappelli which indicated that a carbon copy was provided to Coyne, that while Coyne's specific responsibilities as an environmental prosecutor were limited, there were references in that memorandum to broader allegations and broader investigations concerning Woloohojian Realty Inc., Harwol Construction Company, and Harwol Properties which continues to this date.
The state provided the court with "the file"[4] for an incamera review.[5] Within "the file" were documents relevant to this matter which reveals the following; on February 25, 1992, an "Initial Complaint Report" form of the Office of Criminal Investigation of the Department of Environmental Management was created. On a "Case Information Form" from DEM, with the date received listed as February 25, 1992, it indicated, "agent assigned: D. Thatcher," which provided in part that the matter concerned, ". . . solid waste," the suspect listed as "Lester S. Fayerweather," the
"Generator; Harwol Consts. Co.," identified as, "other suspects: Woloohojian Realty Co., (Parent Co. of Harwol)."
In the first memorandum in "the file" from David Thatcher to Martin Cappelli on this issue dated March 2, 1992, Thatcher wrote in part, ". . . the construction debris . . . (disposed of by Fayerweather) may have originated from the Sparrows Point Housing Development . . . in Warwick. Sparrows Point . . . is a Section 8 government housing project . . . ."
In a later memorandum to Cappelli dated March 5, 1992, it identified the property where the disposal had taken place at as, ". . . property located off of 1149 Cowesett Road, Warwick, R.I." Thatcher wrote in part, ". . . Upon entrance to the Sparrows Point 1 housing complex, which had a sign indicating that Sparrows Point 1, 2 and 3 are a (Harwol Properties Community) . . . . This investigator spotted a . . . truck . . . (with) `Fayerweather's' name . . . . Also located on the Sparrows Point 1 housing complex . . . (were) two large dump trucks were found to bear the name of "Harwol Construction . . . ."
"The file" contains a written copy of a taped telephone conversation occurring on March 17, 1992, with Fayerweather, by Thatcher, which contained the following discussion, "Lester Fayerweather: Well, I guess in the past when they were doing it they provide the dumpster." "Investigator Thatcher: When you say `they,' you mean Woloohojian Realty." "Lester Fayerweather: Yeah. They provided it." At another point in the taped telephone conversation, Fayerweather says, "Well, let me say this to you, me and the other guy, meaning the other Woloohojian (other than James Woloohojian) we have cleaned that out in the past . . . ."
"The file" contains a March 19, 1992 memorandum to Cappelli from Thatcher. Thatcher wrote in part, "Harwol Construction Company, Inc., which provides facility maintenance management on both Section 8 housing and commercial rental units, is a separate corporation from Woloohojian Realty which ownes (sic) such properties as the Sparrows Point 1, 2 and 3 Section 8 housing development . . . . Upon my arrival at Harwol's Construction garage, this investigator was met by . . . and Mr. James H. Woloohojian, Jr. At this point . . . this investigator identified himself as a police officer with the Department of Environmental Management. . . . Both individuals are employed by Harwol Construction Company, Inc. James H. Woloohojian, Jr., stated . . . he is the owner of Harwol Construction Company, Inc. Mr. Woloohojian was questioned . . . regarding . . . solid waste which was found dumped (by Fayerweather)."
"The file" contains a March 20, 1992, eight (8) page "Witness Statement" of Harry J. Woloohojian, d/o/b, 6/17/64, by Thatcher (also listed as present was "Agent John Killian"). In his statement, Mr. Woloohojian stated he was employed by Woloohojian Realty Corp.; that the principals at "WRC" were James Woloohojian, Jr., and the estate of Harry J. Woloohojian; that Harwol Construction Company is a separate entity from Woloohojian Realty but the principals are the same; that he is the owner of Harwol Construction Company together with his cousin James H. Woloohojian; that he is familiar with Fayerweather Construction Company as they perform subcontract work for "us" including gyp-crete removal.
"The file" includes a March 20, 1992 memorandum from Thatcher to Cappelli which states in part, ". . . (I)t should be noted that in an earlier taped witness statement with Mr. (Harry J.) Woloohojian on this date at `WRC' Headquarters located at 20 Centerville Road, Warwick, R.I."[6] It goes on to state at another point, "(M)r Woloohojian continued by stating that he was angry to think that Mr. Fayerweather . . . would do something like this . . . ."
Three (3) memoranda within "the file" from Thatcher to Cappelli dated March 23, 1992, March 25, 1992, and another dated March 25, 1992, while not mentioning "the entities" or any of their principals, identify the subject matter of the memoranda as, "(C)ontinued investigation into the unlawful disposal of solid waste . . . on property located off of 1149 Cowesett Road in Warwick. R.I."
"The file" contains a memorandum from Thatcher to Cappelli dated March 27, 1992, the subject being, "Appearance before the Statewide Grand Jury . . ." seeking subpoenas "for legal documents for the following corporations . . .; 1) Woloohojian Realty Corporation; 2) Harwol Construction Company Inc.; 3) Sparrows Point I, II and III (corporation separate limited partnerships); 4) Fayerweather Construction Company." The memorandum goes on to indicate the ". . . investigation into the allegations that solid waste was alleged to have been illegally disposed of during the past several years from the Sparrows Point Housing Complex . . . and also at other Woloohojian Realty properties located around the State of Rhode Island."[7]
According to a memorandum dated April 2, 1992, within "the file" the subpoena was served on April 1, 1992, and were accepted by "Robert G. Pilkauskas, who is the principal accountant for said corporations."[8]
A document labeled "Confidential" from Thatcher to Cappelli dated April 7, 1992, which included the notation, "cc: Gerald Coyne" indicated that the subject of the memorandum as being, "Allegations of a conspiracy to illegally dispose of solid waste (construction debris) in Rhode Island and of possible fraud involving both state and federal lending institutions." This memorandum stated in part, "(T)he allegations which Mrs. Perri alluded to at this time were that of a possible conspiracy by Woloohojian Realty Corporation and its subsidiary, Harwol Construction Company, to bilk the Rhode Island Housing and Mortgage Finance Corporation, along with the Federal Department of Housing and Urban Development out of monies for extensive renovation and repair work performed at Woloohojian Realties, Section 8 housing developments . . . ." The memorandum continued, "Mrs. Perri elaborated somewhat more on the topic of fraud alleged to have been committed by both Woloohojian Realty Corporation and Harwol Construction Company . . . ." It continues, ". . . (I)t was stated that a contractor, such as Harwol Construction Company, was required to submit at least two (2) bids from competitive contractors in addition to their own bid before contracts are awarded by Rhode Island Housing and Mortgage Finance Corporation for work specified within the particular contract . . . . Mrs. Perri contends that Harwol Construction Company was engaged in a bid-rigging practice with friendly construction companies who would artificially inflat (sic) their quotes for repair and maintenance work relating to Section 8 housing facilities . . . ." It goes on to state, ". . . (T)his practice would guarantee Harwol Construction Company (Woloohojian Realty Corporation) of being awarded very lucrative construction contracts at inflated prices . . . ."
The memorandum goes on to recite additional matters which support the position of the memorandum, including the discovery, ". . . On March 27, 1992, . . . a vacant lot located in Providence, R.I. where construction debris similar in appearance to that material found at 1149 Cowesett Road was disposed . . . ."
"The file" contains a copy of a Felony Criminal Complaint filed against Fayerweather by DEM which shows an arraignment date of April 15, 1992, alleging a violation of Section 23-18.9-5 of the General Laws, disposing, ". . . of more than (3) cubic yards of solid waste on diverse dates between July 1, 1991 and November 1, 1991 . . ." Although there were additional memoranda within "the file," it is not until May 13, 1992, when the first memorandum addressed to Coyne appears which identified the subject being, "Technical data on gyp-crete subflooring products in reference to Fayerweather Construction Company." The memorandum went on to state in part, ". . . As you can see, gyp-crete is composed of a mixture containing only three to twelve percent (3-12%) Portland cement. The primary ingredient contained within gyp-crete is plaster of Paris (80-95%) . . . ."
"The file" also contained a May 20, 1992 memorandum from Thatcher to Coyne, subject, "Grand Jury Data (Woloohojian Realty Corporation and Harwol Construction Company, Inc., Subpoenas) found to be omitted from records provided by the aforementioned corporation . . . ." which outlined two areas of concern.
A series of memorandum contained in "the file" were generated thereafter concerning the analysis of the materials seized in Providence ultimately concluding in a memorandum in "the file" from Christopher Shafer, Engineer, DEM to Thatcher dated July 1, 1992, which concluded that, ". . . the material is not gypcrete . . . ."
A subsequent twelve (12) page memorandum dated March 9, 1993, from Thatcher to Cappelli concerning "updated status . . . into unlawful disposal of solid waste by Fayerweather Construction . . . involving various Section 8 housing developments located in R.I." After chronicling the investigation to that date it concluded by stating;
 "The two issues at hand at this time appear to be; 1. The appearance of illegal disposal practices by the aforementioned companies regarding the disposal of construction debris associated with said Section 8 housing developments; and, 2. Possible fraud against the U.S. Government specifically relating to the reimbursement of monies paid to Woloohojian Realty Corporation by RHMFC for what was supposed to be legal disposal of construction materials affihated with work performed at the aforementioned Section 8 housing developments."
"The file" contains numerous memorandum from Thatcher to Cappelli concerning the analysis of the gyp-crete prior to Coyne's "Review of Pending Cases" memorandum to Cappelli dated December 29, 1993. Coyne's "Review" memo contained the following entry, "35 Lester Fayerweather, Sr. (92-0019). Defense counsel submitted lab results regarding analytical tests of material alleged to be solid waste. Results showed high concentration of Portland Cement. Forwarded results to OCI for transfer to Regulatory. Awaiting response."
An October 12, 1994 memorandum, following Coyne' s departure from the Attorney General's Department, from Thatcher to Cappelli concerning, "(A)ppearance before the Statewide Grand Jury . . . relating to business records for one Lester S. Fayerweather, Sr, . . . along with Fayerweather Construction Company . . ." later states in part, "(s)hortly after Mr. Fayerweather's testimony, this investigator was called in before the Grand Jury and at that time a formal request was made for the aforementioned subpoenas. The Grand Jury was informed at that time by Assistant Attorney General Haggerty that the investigation relative to the subpoenas may be expanded to include matters other than alleged environmental crimes . .
A March 21, 1996 memorandum from Thatcher to Cappelli concerning the subject of, ". . . unlawful disposal of solid waste by one Lester S. Fayerweather . . ." focused on a meeting held with Lt. Mattos of the State Police, Assistant Attorney General James Ryan, Martin Cappelli, and Thatcher wherein it was stated in part, ". . . Special Assistant Attorney General James Ryan stated, . . . the Attorney General's Office is preparing to move forward with its criminal case against the principals of Woloohojian Realty Corporation/Harwol Construction Co., in connection with unrelated crimes which surfaced during the course of an environmental investigation initiated by this office on February 21, 1992 . . . ."
Although the petitioner's witness (Killian) testified that the State Police were aware of a Civil Fraud Complaint which involved many, if not all, of the entities, their principals, as well as some of the allegations made during the environmental investigation, the state argues that the information Coyne acquired was from when he was employed by the Attorney General's Department and not from any other source.
To rebut this claim, Respondent offered into evidence Exhibit "E" which included the following: a seventy-seven (77) page Civil Complaint KC 93-759 (filed on August 25, 1993, which was dismissed by the court (Darigan, J. On May 11, 1995), entitledElizabeth V. Bogosian vs. James H. Woloohojian, et al., as well as Rhode Island Housing Mortgage and Finance Corporation which sought compensatory damage against all defendants in the sum of fifty million dollars and punitive damages against all defendants in the sum of one-hundred million dollars.
The complaint alleged, amongst other claims, a plot between James H. Woloohojian and Menas P. Woloohojian to deprive Bogosian of her real property; deprivation of income she was entitled to receive from those properties; siphoning off large sums of money from various Section 8 projects to the detriment of the United States Department of Housing and Urban Development (HUD) and others; fraud based upon no bid,[9] fictitious bids, rigged bids, fictitious purchases or fictitious services or when government subsidized apartment projects effectively paid expenses related to non-subsidized (i.e., privately owned apartments); illegally dumping gyp-crete after being paid to properly dispose of gyp-crete; the gas stove fraud; the refrigerator fraud; and the carpet replacement fraud.
Also included within Exhibit "E" was a letter from Special Assistant Attorney General Kathleen Haggerty to Attorney Devereaux concerning the Statewide Grand Jury, dated December 1, 1994, where she wrote in part, ". . . I have represented to you that none of the Woloohojians or Mr. Pilkauskas are targets of the investigation at this point in time. That obviously is not tosay that if in the course of our investigation it is determinedthat there has been criminal wrong doing on the part of any orall of your clients it will not be prosecuted . . . ." (Emphasis added.)
Also within Exhibit "E" was a letter from Lt. Robert Mattos, Director, State Police Financial Crimes Unit, dated September 5, 1995, to then Chairman (now Associate Justice Frank Williams) of Rhode Island Housing Mortgage Finance Corporation where he wrote in part, ". . . (A)lso at our August 4th meeting, I informed you that the State Police have obtained the cooperation of a vendor who has admitted being asked to create false bids that were later submitted to RIHMFC by Peter Woloohojian on two occasions in 1990 . . . . That vendor is . . . ." He continued, "(T)he Gypcrete Fraud . . . we believe that we have uncovered evidence that the Woloohojian's overstated their costs to remove gyp-crete in 1988 and in subsequent years at RIHMFC projects . . . ."
Exhibit "E" included a memorandum, "State's Opposition toMotion to Quash" submitted by Petitioner in, "In Re Grand Jury Subpoenas" M.P. 97-0953[10] wherein they argued that a criminal investigation is ongoing by the Rhode Island State Police which". . . has focused on the misuse of project reserve funds by the Managing Agent, The Woloohojian Realty Corp., (WRC), in connection with the awarding of contracts to the Woloohojian `identity of interest' contractor (Harwol Construction Co., Inc.) and others. Under investigation are a number of contract awards which deal with a variety of services related to maintaining the developments such as the replacement of rubber tile, carpeting, and appliances such as gas stoves." The memorandum outlines the scope of the investigation into a specific contractor and identifies that contractor by name. The memorandum does not identify directly by name Lester Fayerweather or Fayerweather Construction Company, however, Petitioner in their memorandum argued, "(E)ach of the three new subpoenas which are the subject of this motion bear the proviso that, `These records requested do not include the records of [the specifically named contractor] which were previously subpoenaed."'
DISCUSSION
As an initial starting point, it is necessary to address the burden of proof which rests upon Petitioner in this matter. Although no Rhode Island case squarely on point has been provided to the court, Petitioner argues that the burden should be no greater than the burden of proof imposed upon a party seeking a preliminary injunction in a civil matter that is a prima facie showing that unless the relief requested is granted it will suffer harm. (Petitioner's Memorandum of Law submitted June 17, 1997). Prima facie evidence is, "that amount of evidence which, if unrebutted, is sufficient to satisfy the burden of proof on a particular issue." Nocera v. Lembo, 121 R.I. 216, 397 A.2d 524
(1979); J.B. Prata, Ltd. v. Bichay, 468 A.2d 266, 267 (R.I. 1983).
Therefore, Petitioner, in summary is required to prove by prima facie evidence as it has alleged that Respondent;
(a) Was employed as an attorney by the Rhode Island Department of Attorney General from April 17, 1988 to January 3, 1994, and worked with the Department of Environmental Management and the State Police Financial Crimes Unit in investigating "WRC," "HCC," and Fayerweather Construction Company, as well astheir principals (emphasis supplied);
(b) That during his tenure he either acquired certain information regarding an ongoing investigation concerning, or had access to, confidential information about the investigation of "WRC" and "HCC," which was obtainable only from his former employment (emphasis supplied);
(c) Is presently representing "WRC," "HP," and "HCC," in an ongoing matter where either his prior knowledge of confidential matters or his access to confidential matters could pose a detriment to Petitioner interest as his former client.
Concerning the first element based solely on the testimony from Respondent that he was employed as an attorney within the Department of the Attorney General during the relevant time frame assigned to prosecute environmental crimes, Petitioner has satisfied its burden.
Concerning the second element to rebut the claim that the information was obtainable only through Respondent's prior employment substantial credible evidence and argument from Respondent was presented and considered by this court, that the "certain information" regarding an ongoing investigation has been presented or will be presented before the Statewide Grand Jury is information presently in the public domain. No direct evidence was submitted concerning the past and future testimony before the Grand Jury.
To accept Respondent's argument would require this court to speculate both as to what testimony has as well as what testimony will be offered before the Statewide Grand Jury. This court is not inclined to speculate on those issues. Based upon the evidence submitted and from the testimony of the witnesses, this court is satisfied that Petitioner has met its burden of proof that during the relevant time frame, Respondent worked with the Department of Environmental Management in its investigation of Lester Fayerweather and his relationship with "WRC" and "HCC" as well as their principals and that he had, at minimum, access prior to his departure to confidential information which relates to an "expanded ongoing investigation" of "the entities" and their principals which had as its origin the environmental investigation of Fayerweather.
While the evidence is not as clear that Respondent was involved with the Rhode Island State Police investigation of "the entities," the minimal burden of proof is nevertheless satisfied. "The file" contained the April 7, 1992 memorandum from Agent Thatcher to Chief Cappelli, carbon copied to Respondent which addressed not only illegal disposal of solid waste from properties owned by "the entities" with the alleged knowledge of "the entities," but went on further to state the possible conspiracy by Woloohojian Realty Corporation and its subsidiary, Harwol Construction Company, to bilk the Rhode Island Housing and Mortgage Finance Corporation out of monies for extensive renovation and repair work performed at Woloohojian Realties, Section 8 housing developments. Given Respondents then primary assignment to prosecute environmental crimes, it is reasonable to conclude that he knew or should have known that DEM lacked jurisdiction to investigate these allegations and that the Rhode Island State Police was a likely agency to continue that investigation.
As to the last element, it is clear beyond any doubt that Respondent currently represents "WRC," "HP," and "HCC," and at least one of those entities through its representatives was subpoenaed to appear before the Statewide Grand Jury.
In Rhode Island, as in most jurisdictions, attorneys admitted to practice law are required to do so within ethical boundaries established by the admitting authority. By Supreme Court Rules, the Rhode Island Supreme Court has promulgated and adopted Rules of Professional Conduct which govern most, if not virtually all, aspects of an attorney's practice of their profession. One of those aspects generally is where an attorney undertaking the representation of a new client whose interest is or may be adverse to a former client and specifically when the attorney formally was a government employee.
The pertinent provisions of the rules which Petitioner allege that Coyne, by virtue of his undertaking to represent "WRC," "WRA," "HP," and "HCC," may be disqualified from further representation read as follows:
 Article V, Rule 1.9 Conflict of interest: Former client. A lawyer who has formerly represented a client in a matter shall not thereafter:
 (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
 (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 and Rule 3.3 would permit or require with respect to a client or when the information has become generally known.
 Article V, Rule 1.11 Successive government and private employment:
 (a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated as a public officer or employee.
 (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.
 (e) As used in this Rule, the term "matter" includes: (1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties, and (2) any other matter covered by the conflict of interest rules of the appropriate government agency.
 (f) As used in this Rule, the term "confidential government information" means information which has been obtained under government authority and which, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public.
Prior to the adoption of Supreme Court Rule, Article V, Rules of Professional Conduct in November 1998, the conduct of attorneys admitted to practice law before the courts in Rhode Island were governed under the Code of Professional Responsibility. Disciplinary Rule 9-101(B) of the former Code of Professional Responsibility contained a restriction on successive private employment following government employment similar to current rule, Article V, Rule 1.11 Professional Conduct.
In Olivier v. Town of Cumberland, 540 A.2d 23 (R.I. 1988), in deciding whether successive private employment following government employment should require disqualification of plaintiff's attorney as requested by defendant, the court held that under the facts presented that the trial court properly denied defendant's motion to disqualify. The court, in Olivier, discussing whether or not the successive private employment by plaintiff of the former Attorney General stated, ". . . (T)he central issue in the present dispute, we believe, is whether Violet had `substantial responsibility' for the . . . matter prior to her return as [plaintiff's] counsel." "This particular facet of the rule is generally considered most difficult to resolve." (Citations omitted.) The court went on to provide "In interpreting the phrase `substantial responsibility' we deem it appropriate to quote from [ABA Committee on Ethics and Professional Responsibility Formal Opinion #342 (1975), published in Formal and Informal Ethics Opinions at 112 (1985)] Formal Op. 342.
 `[The term] envisages a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the matter in question. It contemplates a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question . . . Yet it is not necessary that the public employee or official shall have personally and in a substantial manner investigated or passed upon the particular matter, for it is sufficient that he had such a heavy responsibility for the matter in question that it is unlikely he did not become personally and substantially involved in the investigative or deliberate processes regarding that matter."' Supra, A.2d at 25, 26.
In that matter, given the "uncontradicted evidence" that plaintiff's attorney had "no actual responsibility for or knowledge of what was happening in the state's case against [defendant]," the court upheld the trial court's decision. While the defendant in Olivier argued that plaintiff's counsels' continued representation would erode public confidence in the legal profession or make it look bad, the court cautioned, ". . . the appearance of impropriety alone is `simply too slender a reed on which to rest a disqualification order except in the rarest of cases."' Sellers v. Superior Court, 154 Ariz. 281, 289,742 P.2d 292, 300 (1987). Olivier, supra, at 27.
Unlike the facts present in Olivier, supra, in this matter there is no dispute that Coyne had, until his departure from the Attorney General's Department, "actual responsibility" for the criminal environmental investigation of Lester Fayerweather's alleged dumping of materials obtained from one of "the entities." While there was no testimony or documentary evidence that the future direction of this Grand Jury investigation will focus on crimes arising precisely out of the same matter which Coyne was previously involved while a member of the Department of Attorney General, Petitioner's proffer contained in its "Opposition to Motion to Quash" the subpoena's in M.P. 97-0953 that the present focus concerns the alleged misuse of project reserve funds by "WRC" in its award of contract to Harwol Construction and others
including the replacement of rubber tiles, this court cannot say that the present Grand Jury will not be asked to consider possible criminal actions arising out of substantially the samematter of the disposal by Fayerweather of the materials from one of "the entities" which Coyne was directly involved in.
In further support of its requested relief Petitioner relies upon the Pennsylvania Supreme Court decision, in Pirillo v.Takiff, 341 A.2d 896 (Pa. 1975). That matter involved a Grand Jury investigation into potential corruption by Philadelphia police officers. The trial court relying upon; (1) the attorney's multiple representation of individual witness' right to effective counsel; (2) the attorney's fee compensation arrangement with the individual witness' employment association [Philadelphia Fraternal Order of Police, (FOP)]; and, (3) serious detriment to the Grand Jury function that, based upon multiple representation, the unlikelihood of an attorney persuading one individual witness to cooperate against another individual witness disqualified an attorney and his associate from representing twelve individual's who were summoned to appear before a Grand Jury. On appeal, while not agreeing that multiple representation by an attorney always justifies disqualification, that court affirmed the trial court's decision on the basis that the attorneys involved were not only paid by the FOP to represent the individual witnesses, they also represented the FOP as well as the Pennsylvania Supreme Court's Disciplinary Rule prohibiting, "Avoiding Influence by Others than Client." The court in Pirillo observed:
 "We have recently stated: `(A) trial judge in the exercise of his inherent power to control litigation over which he is presiding and his duty to supervise the conduct of lawyers practicing before him so as to prevent gross impropriety, has power to act where the facts warrant it . . . . Where a breach of ethics is made to appear, the relief is usually the granting of a motion to disqualify and remove the offending lawyer, and has been employed in this State as well as other jurisdictions."' (Citations omitted.) Pirillo, supra, at A.2d 904.
That court further held, "The test for determining whether there is an impairing conflict is probability, not certainty." "A court is not bound to sit back and wait for a probability to ripen into a certainty; it may restrain conduct which has the potential for evolving into a breach of ethics before such conduct becomes ripe for disciplinary actions." (Citations omitted.) Pirillo, supra,
at A.2d 905.
The court in Pirillo recognized that there were competing interests involved in deciding whether to disqualify an attorney identifying four factors which were central to determine if the request was reasonable. They are:
 "(1) Whether the state interest[s] sought to be achieved can be effectively accomplished in some manner which will not infringe upon interests protected by constitutional rights; (2) Whether the state interest[s] [are] sufficiently compelling when compared with the interests affected [to justify] any infringement of those interests; (3) whether the state interest[s] [are] sufficiently compelling to justify the degree of infringement that is necessary to effectuate that interest; (4) Whether the provision under challenge represents the narrowest possible infringement consistent with effectuating the state interest involved." (Citations omitted.) Pirillo, supra, A.2d at 905.
Applying the factors cited in Pirillo to this matter, while it is without question that Coyne has a right to pursue his profession, the right to do so may, under certain circumstances, be curtailed. As no infringement of a constitutional right has been argued, this court need not consider interest number 1 and 2.
As to interest number 3, a client such as Petitioner here, has a compelling interest to prevent disclosure of confidential information gained while the attorney represented it. Otherwise, clients may choose not to reveal confidential information to an attorney for fear it may be later used against them.
In deciding whether to disqualify an attorney from representing a client when claims of conflict of interest were raised in violation of Canon V, Rule 1.7, Chief Judge Lagueux observed, "(I)t is imperative, however, to recognize that disqualification motions are largely dependent upon the situations presented and must be decided in a case by case basis until the law in this area is further developed." Gray v. RhodeIsland Department of Children, Youth and Families, 937 F. Supp. 153, 160 (D.R.I. 1996).
In consideration of the evidence and the authorities relied upon, this court will grant Petitioner's Motion to Disqualify Respondent from further representation of "the entities" in matters before the Statewide Grand Jury resulting from the initial environmental investigation initially supervised by Respondent while a member of the Department of Attorney General. As the court in Pirillo observed, ". . . (A) court . . . may restrain conduct which has the potential for evolving into a breach of ethics before such conduct becomes ripe for disciplinary action." (Citations omitted.) Pirillo, supra, at A.2d 905. However, it must be clear that by this ruling this court is not deciding that Respondent has violated any relevant provision of the Rules of Professional Conduct. Further, as this matter has been sealed by this court to protect the privacy of the Grand Jury proceeding, the parties are hereby restrained and enjoined from any dissemination of the factual basis of this decision to any person other than for purpose of appeal.
The moving party shall submit an Order consistent with this Decision.
[1] Within Exhibit "B" which was redacted, the memorandum indicates that the subjects of the subpoenas were, "ordered to provide documents and records pertaining, but not limited to, the installation and removal of a commercial product referred to as Gypcrete . . ."
[2] Within Exhibit "B" which was redacted was information provided to Thatcher that Woloohojian Realty listing the principals as M. Peter Woloohojian, Controller: Robert Pilkauskas, Treasurer: James H. Woloohojian, Trade Name: Harwol Properties Corporation, Harwol Construction Corporation Inc., Principals, James Woloohojian, Jr., and Harry Woloohojian, III, and Fayerweather Construction Company, Principal Lester S. Fayerweather, Sr., all may have been involved in the dumping incident.
[3] The letter from Attorney Stephen A. Rodio dated April 10, 1992, appended to Exhibit "B" separated the records submitted from "WRC" giving "a list of Section VIII . . . properties where floor removal and installation . . . occurred from March of 1989 to present; list of employees; list of principals; list of vehicles owned or leased. As to Harwol, "copies of billings submitted to RIHMFC for floor removal and replacement at the Sparrows Point I, II, and III from March of 1989 to present; copies of billing . . . at any other Section VIII housing developments managed by WRC from March of 1989 to present . . ."; "Records regarding Dumpster Rentals for work regarding floor removal and/or replacement at Section VIII housing facilities from March 1989 until present; list of employees of Harwol; list of vehicles owned or leased by Harwol"; "A list of all subcontractors who performed flooring work at Section VIII housing facilities from March of 1989 until present; a list of principals of Harwol."
[4] The Attorney General's Environmental File ("the file") was marked as Exhibit 5 Full. It measures one and one-quarter inches in thickness. The earliest document was dated November 29, 1988, the last dated September 23, 1996. "The File" contains a variety of investigative notes, memoranda, scientific analysis, as well as literature purportedly from, "Materials Methods ofArchitectural Construction, 1988 on the subjects "Concrete" and "Lime, Gypsum, and Cement."
[5] Although not an exhaustive comment on all of the documents within "the file," the documents that are referred to are of significance to the determination of the limited issue before the court.
[6] The same location of the property identified in the search warrant where according to Detective Killian's testimony Coyne was present on April 21, 1997.
[7] The requested documents were presumably the ones that were provided to Coyne by Attorney Rodio as referenced previously in footnote 3.
[8] Pilkauskas is the same person Coyne was representing as co-counsel before the statewide Grand Jury on June 11, 1997.
[9] Listed as an example for this type of fraud was, "the Gyperete fraud" which related to the construction of and not the removal of the Gyp-crete.
[10] It is not known to the court the outcome of this matter, however, for the purpose of this hearing a decision either granting or denying the Motion to Quash is not relevant.